## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-mc-00105-RM

UNITED STATES DEPARTMENT OF JUSTICE, DRUG ENFORCEMENT
ADMINISTRATION,

      Petitioner,

v.

STATE OF COLORADO BOARD OF PHARMACY,
PATTY SALAZAR, EXECUTIVE DIRECTOR OF THE COLORADO DEPARTMENT OF
REGULATORY AGENCIES, and
APPRISS, INC.,

      Respondents.

---

### STATE RESPONDENTS' BRIEF IN OPPOSITION
### TO DEA PETITION TO ENFORCE ADMINISTRATIVE SUBPOENAS

---

PHILIP J. WEISER
Colorado Attorney General

Christopher P. Beall
Pamela D. Jackson
Krista F. Batchelder
Robert C. Staley
Colorado Department of Law
1300 Broadway, 8th Floor
Denver, Colorado 80203

*Counsel for State Respondents*
*State of Colorado Board of Pharmacy¸ and*
*Patty Salazar, in her official capacity as Executive*
    *Director of the Colorado Department of Regulatory*
    *Agencies*

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

   1. Creation and operation of the PDMP as a resource for prescribers and dispensers.....................2

   2. Limited law enforcement access to specific PDMP records.........................................................3

   3. The DEA's broad "whole pharmacy" requests for PDMP records. ..............................................4

SUMMARY OF THE ARGUMENT ....................................................................................6

ARGUMENT .........................................................................................................................8

   I. The DEA's Demands for Personally Identifying Information from the PDMP Seek
      Information Protected by the Fourth Amendment. ....................................................8

     A. The Fourth Amendment protects personal information when there is a subjective
        expectation of privacy that society is prepared to recognize...................................8

     B. Patients have a recognized privacy interest in their prescription records..............................9

     C. Patients have a reasonable expectation of privacy under the Fourth Amendment in
        the aggregated, digitized form of their prescription records maintained by the
        PDMP. .............................................................................................................10

     D. Patients' Fourth Amendment privacy interests outweigh a mechanical application of
        the third-party doctrine.......................................................................................15

     E. Whalen is not dispositive of Respondent's Fourth Amendment arguments.........................18

   II. The DEA's Justification for Why It Needs Patient Identifying   Information for More
      Than 14,000 People Who Are Not the Subjects of Its Investigation Does Not Meet the
      "Reasonable Relevance" Test Under the Fourth Amendment. .................................20

     A. The DEA's requests for patient-identifying information is not "relevant in purpose"
        because the patients' identities are not germane to the investigation of the targeted
        pharmacies.........................................................................................................21

     B. The DEA's requests are not "sufficiently limited in scope" because they are not
        targeted in terms of medications or patients.......................................................25

CONCLUSION....................................................................................................................26

## TABLE OF AUTHORITIES

PAGE

**CASES**

Aid for Women v. Foulston, 441 F.3d 1101 (10th Cir. 2006) ............................................. 9

Becker v. Kroll, 494 F.3d 904 (10th Cir. 2007)............................................................. 20, 24

Bertoldi v. Wachtler, 952 F.2d 656 (2d Cir. 1991)............................................................. 21

Boyd v. United States, 116 U.S. 616 (1886).......................................................................... 9

Carpenter v. United States, 138 S.Ct. 2206 (2014)................................................... passim

Carroll v. United States, 267 U.S. 132 (1925) .................................................................... 9

City of Seattle, 387 U.S. 541 (1967)............................................................................... 20, 25

Douglas v. Dobbs, 419 F.3d 1097 (10th Cir. 2005)....................................................... 9, 20

Herring v. Keenan, 218 F.3d 1171 (10th Cir. 2000) .......................................................... 9

In re Grand Jury Subpoena Duces Tecum Issued on June 9, 1982, 697 F2d 277 (10th Cir. 1983) ............................................................................................................................. 25

In re McVane, 44 F.3d 1127 (2d Cir. 1995) ................................................................. 21, 22

In re Search Warrant, 810 F.2d 67 (3d Cir. 1987) .......................................................... 10

Katz v. United States, 389 U.S. 347 (1967)................................................... 8, 13, 15, 21

Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011) ............................................................ 20

Kyllo v. United States, 533 U.S. 27 (2001) ...................................................................... 10

Or. Prescription Drug Monitoring Program v. U.S. Drug Enf't Admin., 860 F.3d 1228 (9th Cir. 2017).................................................................................................................... 14

Or. Prescription Drug Monitoring Program v. U.S. Drug Enf't Admin., 998 F. Supp. 2d 957 (D. Or. 2014)................................................................................................... 13, 17, 19

Pyle v. Woods, 874 F.3d 1257 (10th Cir. 2017) .............................................................. 20

Riley v. California, 573 U.S. 373 (2014) ......................................... 10, 13, 15, 16

# TABLE OF AUTHORITIES

**PAGE**

Smith v. Maryland, 442 U.S. 735 (1979) .......................................................... 8, 15

U.S. Dep't of Justice v. Utah Dep't of Commerce, Case No. 2: 16-cv-611-DN-DBP, 2017
    WL 3189868, at *8 (D. Utah July 27, 2017) ............................ 14

United States v. Di Re, 332 U.S. 581 (1948) ...................................................... 9

United States v. Donaldson, 400 U.S. 517 (1971) ............................................. 20

United States v. Gurule, 437 F.2d 239 (10th Cir. 1970) ................................... 20

United States v. Harrington, 388 F.2d 520 (2d Cir. 1968) ................................ 21

United States v. Jacobsen, 466 U.S. 109 (1984) ............................................... 17

United States v. Jones, 565 U.S. 400 (2012) .................................................... 11

United States v. Miller, 425 U.S. 435 (1976) .............................................. 15, 16

United States v. Moore-Bush, 381 F. Supp. 3d 139 (D. Mass. 2019) ............... 14

United States v. Morton Salt Co., 338 U.S. 632 (1950) .................................... 20

United States v. Powell, 379 U.S. 48 (1964) ..................................................... 20

United States v. Reno, 522 F.2d 572 (10th Cir. 1975) ...................................... 20

Whalen v. Roe, 429 U.S. 589 (1977) .......................................................... 9, 18, 19

**STATUTES**

§ 12-22-701(c) (2005), C.R.S. ............................................................................. 2

§ 12-280-401(1)(d) (2012), C.R.S. ...................................................................... 4

§ 12-280-401(c) (2019), C.R.S. ........................................................................... 2

§ 12-280-404(3)(g), C.R.S. .................................................................................. 4

§ 12-42.5-401(1)(d) (2011), C.R.S. ..................................................................... 4

§ 12-42.5-401(1)(d) (2012), C.R.S. ..................................................................... 4

# TABLE OF AUTHORITIES

**PAGE**

12-280-401, C.R.S. ................................................................................................................. 2

12-280-409, C.R.S. ................................................................................................................. 2

HB 05-1130 ............................................................................................................................ 2

HB 12-1311 ............................................................................................................................ 4

SB 11-192 ............................................................................................................................... 3

## RULES

45 C.F.R. § 150.512(f)(1)(ii)(C) .......................................................................................... 24

45 C.F.R. § 160.512(f) ......................................................................................................... 23

Respondents State of Colorado Board of Pharmacy and Patty Salazar, in her official

capacity as Executive Director of the Colorado Department of Regulatory Agencies ("State

Respondents"), through their undersigned counsel, hereby submit this Brief in Opposition to

DEA Petition to Enforce Administrative Subpoenas ("Petition") (Dkt. No. 1, Nov. 4, 2019) filed

by Petitioner United State Department of Justice, Drug Enforcement Administration ("DEA"),

with their argument supported by the accompanying Declarations of Karen M. McGovern, Justin

Wipf, and Christopher P. Beall and the exhibits attached thereto, and state as follows:

## **INTRODUCTION**

In this matter, the DEA seeks to violate the privacy rights of 14,000 patients whose

medical information is stored in the Colorado Prescription Drug Monitoring Program ("PDMP")

so the DEA can investigate two pharmacies.  State Respondents offered, and have here produced,

de-identified, psuedonymized records responsive to the two at-issue DEA subpoenas and stand

ready to respond to follow-up requests for particularized patient information when the DEA

identifies individualized targets of investigation from its analysis of the produced data.  The

DEA contends that it must know the identity of every one of the patients who received the more

than 200,000 prescriptions at stake in this case, necessarily including the name of every child

who received ADHD medication from these pharmacies, every man who received sexual

impotence medications, and every teenager who received binge-eating medications, among

others.

Each of these patients has a right to privacy with respect to the information in the PDMP.

To overcome that right, the DEA must satisfy the Fourth Amendment's "reasonable relevance"

test for administrative subpoenas.  Its overly broad, undifferentiated demand for the names of all

14,000 patients included in the records at issue here cannot meet that test, especially in the

context of the DEA's justification that its investigation focuses on the two pseudonymous

pharmacies ("Registrant #1" and "Registrant #2") rather than any particular patient.  The Court

should protect these individual patients' privacy until the DEA can do so and should dismiss the

Petition.

**BACKGROUND**[1]

**1.  Creation and operation of the PDMP as a resource for prescribers and dispensers.**

Colorado's PDMP was created by the state's General Assembly in 2005 in response to

the increasing risk associated with the abuse of prescription controlled substances.  According to

House Bill 05-1130, the stated purpose of the PDMP was to provide a "mechanism whereby

prescribers could discover the extent of each patient's requests for drugs, and whether other

providers have prescribed similar substances during a similar time period."  HB 05-1130, Colo.

Rev. Stat. § 12-22-701(c) (2005), now codified as amended and superseded at Colo. Rev. Stat.

§ 12-280-401(c) (2019).

The PDMP database is housed within the Department of Regulatory Agencies and

overseen by the State Board of Pharmacy ("Board").  *See generally* Colo. Rev. Stat. §§ 12-280-

401 through -409.  It is a tool designed for prescribers and dispensers to help reduce prescription

drug misuse, abuse, and diversion by helping them make more informed decisions when

considering prescribing or dispensing a controlled substance to a patient.

Pharmacies are required at the end of every business day to submit information related to

their dispensing of controlled substances to the PDMP.  The specific data the pharmacy must

report, and the data maintained, includes the patient's identity, address, sex, date of birth,

---

[1] This summary of the factual background of this case is supported in detail by the
accompanying Declarations of Karen M. McGovern, Justin Wipf, and Christopher P. Beall and
their accompanying exhibits, to which the Court's attention is directed in full.

prescriber name and DEA registration number, prescription number, medication name, medication amount, the calculation of the "morphine milligram equivalents," date written and date filled.

Prescribers and pharmacists may query the PDMP prior to prescribing or dispensing a prescription controlled substance. This query allows them to review information that may assist in deciding whether the patient should receive the drug. For example, they may be able to see a concerning potential for a drug interaction, or that a patient is already receiving the drug from another source.

The Board has delegated the responsibility of collecting and processing prescription data to Appriss, Inc., which is responsible solely for the collection and processing of the PDMP data. The responsibility to administer the PDMP rests with the Board. *See* McGovern Decl. ¶¶ 11-13.

A pharmacy's primary connection to the PDMP is through its daily reporting to the PDMP database of all controlled substances dispensed in that 24-hour period. While this data does contain patient identifying information, the fact that it is reported to the PDMP does not mean that the pharmacy (or, in actuality the pharmacist or their designee) reviewed the PDMP history of each individual who received a controlled substance that day. Thus, the PDMP does *not* show "[the pharmacy's] own knowledge about those patients and their prescriptions."[2] *Contra* Pet. at 9.

### 2. Limited law enforcement access to specific PDMP records.

In 2011, an additional purpose of the PDMP was identified that would allow law enforcement access to PDMP data under certain specific circumstances. SB 11-192, Colo. Rev.

---

[2] Such query records are housed in a separate data set that is not the subject of the subpoenas at issue in this case. See McGovern Decl. ¶ 10. A review of PDMP prescription data simply will not indicate whether a pharmacist queried the PDMP prescription database prior to dispensing a controlled substance.

Stat. § 12-42.5-401(1)(d) (2011). Then in 2012, the language was further modified to state "[e]lectronic monitoring of prescriptions for controlled substances provides a mechanism for *law enforcement officials and regulatory boards to efficiently investigate practitioner behavior* that is potentially harmful to the public." HB 12-1311, Colo. Rev. Stat. § 12-42.5-401(1)(d) (2012), now codified as superseded at Colo. Rev. Stat. § 12-280-401(1)(d) (2012), (insertion italicized).

Law enforcement officials are only eligible to receive PDMP data if the information released is "specific to an individual patient, pharmacy, or practitioner and is part of a bona fide investigation, and the request for information is accompanied by an official court order or subpoena." Colo. Rev. Stat. § 12-280-404(3)(g); *see also* McGovern Decl. ¶ 18.

The Division of Professions and Occupations ("Division") at the Colorado Department of Regulatory Agencies regularly receives subpoenas or warrants from law enforcement agencies seeking PDMP data to assist in their bona fide investigations of either a specific patient, practitioner, or pharmacy. The DEA is the most frequent requester of PDMP records, accounting for more than 80% of such requests since January 1, 2018. *See* McGovern Decl. ¶ 20. The majority of the DEA's administrative subpoenas have been narrowly targeted to a named patient or prescriber within a limited time period.

### 3. The DEA's broad "whole pharmacy" requests for PDMP records.

Recently, however, the Division has received DEA requests such as the two administrative subpoenas at issue in this case seeking a whole pharmacy's entire record of prescriptions for broad time periods, without specifying any named patient or prescriber. Beginning in June 2019, the Division objected to the disclosure of patient identities when responding to these "whole pharmacy" administrative subpoenas. *See* Ex. 1 to Beall Decl. In the particular instance in June, the DEA's administrative subpoenas for two large pharmacy

chains required the disclosure of patient identities on more than 18 million prescriptions. McGovern Decl. ¶ 26.

Concerned that the DEA's subpoenas required an unreasonable disclosure of patient identities where no bona fide investigation of the patients was at issue, the Division compiled data sets of PDMP prescription records for the targeted pharmacies and substituted the patients' identities with unique numeric pseudonyms.[3] The Division produced these de-identified, pseudonymized data sets with the understanding that if the DEA notified the Division that a particular pseudonym was found to be associated with criminal or improper conduct, then the Division would provide the identifying patient information for that particular patient. The first step in this two-step process was completed on September 20, 2019, with more than 18 million de-identified prescription records produced to the DEA. To date, the DEA has made no follow-up requests for any patient-specific information gleaned from the pseudonymized data sets. McGovern Decl. ¶¶ 26-28.

The subpoenas at issue here (MK-19-823246 and MK-19-875540) are much like the June 2019 subpoenas and ultimately seek the two pharmacies' entire record of all prescriptions dispensed for nearly six years, including the identity of every patient without a bona fide investigation of any specific patient. McGovern Decl. ¶¶ 20-22. The data sought by the DEA would allow the federal agency to replicate the state's database for purposes not contemplated or authorized by the state, effectively removing the careful balance between privacy and patient protection struck by Colorado in its limitations on access to the PDMP. The Division objected, through counsel, to the first of these at-issue subpoenas (for Registrant #1) by letter dated

---

[3] The Division's vendor uses an algorithm that matches unique patients using data such as first name, last name, date of birth, and address, and in the de-identified, pseudonymized data sets, those fields are replaced with a unique numeric pseudonym. *See* McGovern Decl. ¶ 26. The data sets produced to the DEA maintained the pseudonymous patients' actual zip code data.

September 12, 2019, on the grounds that the demand for patient identities in conjunction with the prescription details was an unreasonable intrusion on patient privacy, and offered instead to produce the PDMP data in a de-identified, pseudonymized format.  *See* Exhibit 2 to Beall Decl.

As reflected in the responsive data sets for Registrant #1 and Registrant #2 in Exhibit 1 to the accompanying Wipf Declaration, the range of prescription controlled substances included in the PDMP database is far broader than only opioid medications.  The range of prescription controlled substances includes medications for conditions as varied as insomnia and binge-eating disorders, as well as potentially embarrassing medical conditions such as male impotence or addiction withdrawal.  *See* McGovern Decl. ¶¶ 29-31.

The data sets for the two at-issue subpoenas reflect more than 200,000 prescriptions filled for more than 14,000 patients.  *See id.*  The DEA has provided nothing to the Division demonstrating a need to know the identities of all 14,000 patients, especially when a large portion of these patients received prescriptions that have no bearing on any criminal or improper conduct, let alone an actual, identified bona fide investigation of a specific patient.

## SUMMARY OF THE ARGUMENT

This Court should deny the DEA's Petition because the disclosure of the additional PDMP data the DEA seeks, that is, patient identifying information, would violate the Fourth Amendment right to privacy guaranteed to each of the more than 14,000 patients whose private medical data is at issue.  The Fourth Amendment is implicated whenever the government seeks information in which a person has a legally enforceable, reasonable expectation of privacy.  The patients here have a reasonable expectation of privacy, given Colorado's PDMP statutes and rules that explicitly constrain the disclosure of PDMP data to only those law enforcement agencies with a bona fide investigation of a specific individual.  The mass aggregation of

digitized prescription data creates a detailed, intimate chronology of each individual patients' medical history, which can easily be searched, manipulated, and cross-referenced to reveal deeply personal information that society has long recognized as private.  The DEA's subpoenas would facilitate unlimited fishing expeditions, allowing them to sort and sequence patients' private medical data to take a snapshot of any patient's private health information over the past six years, regardless of whether that patient is suspected of criminal conduct.  This semi-omniscient aspect of the PDMP's data makes the DEA's subpoena far more intrusive than is ordinarily the case for run-of-the-mill administrative subpoenas for business or commercial information, making the DEA's subpoenas rise to the level of a search cognizable under the Fourth Amendment.  Moreover, the DEA's requests are not saved by the fact that patients—who rely on modern medications for their health and survival—have already had their information disclosed to the PDMP.

In the context of an administrative subpoena, to overcome the Fourth Amendment's privacy guarantee, the information requested by the DEA must meet the "reasonable relevance" test, *i.e.*, that the data sought are sufficiently limited in scope, as well as relevant in purpose.  The DEA's subpoenas here cannot meet that standard because there is no sound basis to believe that the names of all of the more than 14,000 patients are each relevant to an investigation of the dispensing practices of the two pharmacies.

In contrast to the 'give-us-everything' approach reflected in the DEA's subpoenas, the State Respondents have proposed a two-step process.  First, the Division has provided de-identified PDMP records for the subject pharmacies, and second, if the DEA finds specific patients have engaged in suspicious activity or that are necessary to further the existing investigations of the subject pharmacies, the Division would provide the DEA with targeted

identifying information for those specific patients.  The Court should find this two-step approach to be all that is required under the Fourth Amendment and therefore deny the DEA's Petition for the production of all patient identifying information in the subject records.

## ARGUMENT

**I.   The DEA's Demands for Personally Identifying Information from the PDMP Seek Information Protected by the Fourth Amendment.**

**A.      The Fourth Amendment protects personal information when there is a subjective expectation of privacy that society is prepared to recognize.**

The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ."  In *Katz v. United States*, 389 U.S. 347, 351 (1967), the United States Supreme Court stated that the Fourth Amendment "protects people, not places," extending the Fourth Amendment's protections beyond property rights to individuals' expectations of privacy.  Thus, what a person "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."  *Id.*

Whether a person is protected from invasive government action under the Fourth Amendment depends on whether the person has a reasonable expectation of privacy.  *Smith v. Maryland*, 442 U.S. 735, 740 (1979).  This inquiry revolves around two questions:  first, whether the person has a subjective expectation of privacy, and second, whether the person's subjective expectation of privacy is "one that society is prepared to recognize as reasonable or justifiable under the circumstances."  *Id.* at 740-41 (quoting *Katz*, 389 U.S. at 351, 353, 361) (internal quotation marks and citations omitted).

The Supreme Court's assessment of which expectations of privacy are entitled to protection under the Fourth Amendment is historically informed by what constituted an unreasonable search and seizure when the Fourth Amendment was first adopted.  *Carpenter v.*

*United States*, 138 S.Ct. 2206, 2214 (2014) (quoting *Carroll v. United States*, 267 U.S. 132, 149

(1925)).  In *Carpenter*, the Court first noted that the goal of the Fourth Amendment is to secure

"the privacies of life against arbitrary power."  *Id.* (quoting *Boyd v. United States*, 116 U.S. 616,

630 (1886)) (internal quotation marks omitted).  The Court then noted that, in drafting the Fourth

Amendment, the Framers intended "to place obstacles in the way of a too permeating police

surveillance."  *Id.* (quoting *United States v. Di Re*, 332 U.S. 581, 595 (1948)) (internal quotation

marks omitted).

### B.  Patients have a recognized privacy interest in their prescription records

In *Whalen v. Roe*, the Supreme Court considered the constitutionality of a 1972 New

York state statute requiring all physicians to submit to the government a record of each Schedule

II controlled substance prescribed to patients.  429 U.S. 589, 592-96 (1977).  In discussing the

case, the Court acknowledged an individual's privacy interest in avoiding disclosure of personal

matters.  *Id.* at 599-600.

The Tenth Circuit Court of Appeals has consistently read *Whalen* to create a

constitutional right of privacy in preventing the disclosure of personal information.  *Douglas v.

Dobbs*, 419 F.3d 1097, 1101 (10th Cir. 2005) (citing *Herring v. Keenan*, 218 F.3d 1171, 1173

(10th Cir. 2000) ("This circuit, however, has repeatedly interpreted the Supreme Court's decision

in *Whalen v. Roe* . . . as creating a right to privacy in the non-disclosure of personal

information.").  In *Douglas*, this Circuit went a step further and concluded that a person

specifically has a constitutional right of privacy in her prescription drug records.[4]  419 F.3d at

---

[4] The State Respondents have standing to raise the privacy interests of the patients whose records are stored in the PDMP database because the state program holds those prescription records for the benefit of those patients, and those patients are otherwise unable to protect their own interests independently because they have been given no notice by the DEA that the DEA is seeking their personal medical information.  *See, e.g.*, *Aid for Women v. Foulston*, 441 F.3d 1101, 1112 (10th Cir. 2006) ("We therefore apply the third-party standing test in a deferential

1102 ("Although we have not extended the "zone of privacy" to include a person's prescription records, we have no difficulty concluding that protection of a right to privacy in a person's prescription drug records, which contain intimate facts of a personal nature, is sufficiently similar to other areas already protected within the ambit of privacy.").

C.   **Patients have a reasonable expectation of privacy under the Fourth Amendment in the aggregated, digitized form of their prescription records maintained by the PDMP.**

Advances in modern surveillance tools have fundamentally influenced the scope of Fourth Amendment protections, thereby limiting the government's efforts to capture individuals' private information.  *See, e.g.*, *Kyllo v. United States*, 533 U.S. 27, 34 (2001); *Riley v. California*, 573 U.S. 373 (2014); *Carpenter*, 138 S.Ct. at 2214.  For example, in *Kyllo*, in the context of the government's use of a thermal-imaging device to detect heat signals from within a defendant's home, the Court indicated that application of the Fourth Amendment must account for ever-advancing technology that could discern all manner of human activity in a home.  533 U.S.at 35-36, 40.  And in *Riley*, in the context of the government's warrantless search of arrestees' cell phone contents incident to lawful arrests, the government argued that searching the data stored on a cell phone was "materially indistinguishable" from a permissible search of an arrestee's wallet, address book, or purse.  573 U.S. at 392-93.  The Court strongly rejected that argument, relevantly stating:

> That is like saying a ride on horseback is materially indistinguishable from a flight to the moon.  Both are ways of getting from point A to point B, but little else justifies lumping them together.  Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of [other personal items].

---

manner and conclude that the physician Plaintiffs may assert the rights of their minor patients.");
*see also In re Search Warrant*, 810 F.2d 67, 70-71 (3d Cir. 1987) (finding third-party standing for physician to protect medical records on behalf of patients).

*Id.* at 393.  The Court held that the warrantless search of a cell phone was a violation of the owner's Fourth Amendment rights.  *Id.* at 403.

Most recently, in *Carpenter*, the Supreme Court held that individuals have a legitimate expectation of privacy in their cell-site location information held by third-parties.  138 S.Ct. at 2219.  The Court determined that the government's effort to subpoena 127 days of cell phone location data implicated the "privacies of life."  *Id.* at 2217 (citations omitted) ("As with GPS information, the time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" (quoting *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring))).

The Court's reasoning was largely predicated on the vividly pervasive nature of cell phone location data that phone companies possess from their subscribers.  *Id.* at 2217-18.  The Court explained that "cell phone tracking is remarkably easy, cheap, and efficient compared to traditional investigative tools," such as attempting to use officers to track a suspect's movements.  *Id.*  Moreover, because individuals carry their cell phones on them at all times, location data "achieves near perfect surveillance."  *Id.* at 2218.

Perhaps most persuasively, the Court expressed serious concerns about the retrospective aspect of cell phone location records.  *Id.*  Because location records are maintained by wireless providers for a period of up to five years, the Government could essentially go back in time to retrace the steps of *anyone* operating a cell phone.  *Id.*  ("[T]his newfound tracking capacity runs against everyone.").  Such technology ensures the government does not need to target a specific individual in advance to follow or further investigate; that individual can be selected after the

11

fact. *Id.* Moreover, because of the richness and timespan of the data, "[w]hoever the suspect turns out to be, he has effectively been tailed every moment of every day for five years." *Id.*

Several themes emerge from these cases. First, Fourth Amendment protections are implicated when the government intrudes upon areas where individuals typically have a constitutional right of privacy (e.g., the home, private affairs, or physical location and movement). Second, the Fourth Amendment must account for advancing technologies, particularly the overwhelming amount of digital data generated and maintained by modern computing systems. Third, ordinarily discrete information that the government might obtain in distinct bits takes on a different character under the Fourth Amendment when it is aggregated and retroactively searched for possible wrongdoing over a long period of time. Fourth, the "element of pervasiveness" of the technology (*i.e.*, how many people could be subject to a future search) is an important factor in a Fourth Amendment analysis.

Applying these themes to the present case, the patients' prescription data in the PDMP records are entitled to Fourth Amendment protection. First, as discussed above, patients have a constitutional right to privacy in their prescription drug records. Thus, patients' identifying information falls within the ambit of privacy protected by the Fourth Amendment and necessitates further analysis.

Second, the PDMP database, in full, contains more than 63 million prescription records. *See* McGovern Decl. ¶ 15. The subpoenas here calls for the production of more than 200,000 prescription records, with each of those records revealing intimate medical information about the patient, the aggregation of which provides a detailed portrait of each patient's medical history over nearly six years. The records show not only when and how a patient is suffering from her various medical conditions, but they also allow for easy sorting and manipulation to reveal

whether the course of treatment has been successful, whether other medications were tried, whether complications ensued, and even whether the patient suffered a relapse. *See* McGovern Decl. ¶¶ 16, 29-30.

Third, due to the retroactive nature of PDMP records, the DEA's request would allow it to peruse six years of prescription information on more than 14,000 patients in an attempt to establish possible criminal conduct. Traditionally, law enforcement would have to identify a specific person suspected of criminal behavior *before* deploying such investigative resources. Applying these modern resources, the investigation has already been conducted by the PDMP for the six years being sought here.

This is highlighted by one of the justifications the DEA presents for needing patient identifying information. Specifically, the DEA seeks to use patient identifying information to determine whether a given pharmacy's patients are under criminal investigation or whether they are known to have engaged in criminal activity by unlawfully reselling medications. Pet. at 11. However, if the DEA is concerned with individuals *known* to have engaged in criminal activity or that are presently under investigation, the DEA may simply subpoena the PDMP data for those named individuals. Instead, the DEA has taken the far more intrusive approach which the Supreme Court cautioned against in *Riley* and *Carpenter*, namely, to retroactively request six years of PDMP data from which to cull for currently unknown targets of investigation.

Of particular note on the privacy question is *Oregon PDMP*, decided before *Carpenter*, which considered whether the DEA could access patient prescription records from Oregon's version of a prescription drug database and determined that patients had a reasonable expectation of privacy under the traditional *Katz* analysis. *See Or. Prescription Drug Monitoring Program v. U.S. Drug Enf't Admin.*, 998 F. Supp. 2d 957, 963-67 (D. Or. 2014), *overruled by Or.*

*Prescription Drug Monitoring Program v. U.S. Drug Enf't Admin.*, 860 F.3d 1228, 1236-37 (9th Cir. 2017) (overruling on standing and preemption grounds while noting "the particularly important privacy interest implicated here").  The court "easily" concluded that patients' subjective expectations of privacy in their sensitive prescription records were objectively reasonable.  *Id.* at 966 ("Although there is not an absolute right to privacy in prescription information, as patients must expect that physicians, pharmacists, and other medical personnel can and must access their records, it is more than reasonable for patients to believe that law enforcement agencies will not have unfettered access to their records.").[5]

Finally, while the DEA argues that *Carpenter* was narrowly confined to the limited question of cell phone location data under the Fourth Amendment, its reasoning may be extended to other circumstances.  Pet. at 19, n.8; *see, e.g.*, *United States v. Moore-Bush*, 381 F. Supp. 3d 139, 150 (D. Mass. 2019), *appeal docketed*, No. 19-1625 (1st Cir. appeal filed Jun. 21, 2019).  Thus, for example, the court in *Moore-Bush* applied *Carpenter*'s reasoning to determine that residents of a home had a reasonable expectation of privacy from the government's utility pole camera, which was installed on a public street to capture all activity at the residents' front door over the course of eight months.  381 F. Supp. 3d at 150 (expressing particular concern that the video was stored in an easily searchable digital database).

Thus, patients whose prescription records are aggregated in the PDMP database have a reasonable expectation of privacy under the Fourth Amendment in that information, especially in its comprehensive, retrospective, digitized form.

_____

[5] The DEA argues that patients should have no expectation of privacy in controlled substances prescriptions given the broad mandate of the Controlled Substances Act, citing *U.S. Dep't of Justice v. Utah Dep't of Commerce*, Case No. 2: 16-cv-611-DN-DBP, 2017 WL 3189868, at *8 (D. Utah July 27, 2017).  Pet. at 25.  The holding of this case is obviously not binding on this Court, and is distinguishable because it was decided before *Carpenter* and failed to consider patients' enhanced privacy rights in an aggregated, digitized, and searchable data set.

### D.   Patients' Fourth Amendment privacy interests outweigh a mechanical application of the third-party doctrine.

Under standard Fourth Amendment doctrine, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351.  A person has no legitimate expectation of privacy in information that he has voluntarily provided to third parties.  *United States v. Miller*, 425 U.S. 435, 443 (1976).  This "third-party doctrine" applies "even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *Id.*

However, the Supreme Court stated in *Carpenter* that, while "[t]he third-party doctrine partly stems from the notion that an individual has a reduced expectation of privacy in information knowingly shared with another[,] . . .  the fact of 'diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely.'"  138 S.Ct. at 2219 (quoting *Riley*, 573 U.S. at 392 ("[W]hen privacy-related concerns are weighty enough a search may require a warrant, notwithstanding the diminished expectations of privacy . . . .") (quotation marks and citation omitted)).  The Court also warned that the third-party doctrine should not be applied "mechanically" so as to ignore the context of the information disclosed to third parties.  *Carpenter*, 138 S.Ct. at 2219.  Ultimately, the Court declined to extend its third-party doctrine in *Carpenter*, concluding that the aggregated nature of the information undermined the premise of the third-party doctrine:

> The Government's position fails to contend with the seismic shifts in digital technology that made possible the tracking of not only Carpenter's location but also everyone else's, not for a short period but for years and years.  [Wireless carriers] are not your typical witnesses.  Unlike the nosy neighbor who keeps an eye on comings and goings, they are ever alert, and their memory is nearly infallible.  There is a world of difference between the limited types of personal information addressed in *Smith* and

> *Miller* and the exhaustive chronicle of location information casually
> collected by wireless carriers today.  The Government thus is not asking
> for a straightforward application of the third-party doctrine, but instead a
> significant extension of it to a distinct category of information.

*Id.* at 2219.

Accordingly, an important aspect emerging from *Carpenter* is that ever-increasing compilations of data compel the courts to move beyond mechanical analyses in interpreting the third-party doctrine.  *Carpenter* was "about a detailed chronicle of a person's physical presence compiled every day, every moment, over several years. . . ."  *Id.* at 2220.  Moreover, as *Carpenter* made clear, individuals do not voluntarily "share" certain types of modern information with a third party, at least not "as one normally understands the term."  *Id.* at 2220.  The Court again noted that cell phone services are "'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society."  *Id.* (quoting *Riley*, 573 U.S. at 385).  The Court did not give credence to the idea that individuals have a choice in whether to operate a cell phone.  *Id.*  Instead, the Court assumes individuals will leave behind a trail of location data.  *Id.*  Thus, "in no meaningful sense [do individuals] voluntarily assume the risk of turning over a comprehensive dossier of [their] physical movements."  *Id.* (quotation marks and citation omitted).

Applying the *Carpenter* analysis to the present case, this court should not extend the third-party doctrine to encompass the DEA's subpoenas for patients' identifying information.  First, as discussed above, the PDMP records are a rich database of sensitive patient information compiled in an aggregated, digitized format.  This type of information is closely aligned with the mass storage of years of cell phone location data described in *Carpenter*.  Moreover, rather than request targeted information, the subpoenas seek to replicate the entire database for both at-issue pharmacies, involving sensitive prescriptions for more than 14,000 patients, gathered and

searchable over close to six years, and without knowing if *any* of the patients are suspected of being involved in criminal activity.

Second, the patients have not been provided with a meaningful choice regarding whether to voluntarily disclose sensitive prescription information to third parties.  Much like the cell phone location data in *Carpenter*, it is unfathomable to suggest that individuals will stop using necessary prescription drugs to avoid sharing sensitive patient information with prescribers, pharmacists, and, as a result, the PDMP.  Prescription drugs are, in the words of *Carpenter*, "indispensable to participation in modern society."  138 S.Ct. at 2220.

In *Oregon PDMP*, another federal district court addressed the inapplicability of the third-party doctrine to patient prescription data, succinctly concluding as follows:

> [P]atients and doctors are not voluntarily conveying information to the PDMP.  The submission of prescription information to the PDMP is required by law.  The only way to avoid submission of prescription information to the PDMP is to forgo medical treatment or to leave the state.  This is not a meaningful choice.

998 F. Supp. 2d at 967.  Consequently, there is no compelling rationale for stringently applying the third-party doctrine in this context, particularly where patients have such a strong Fourth Amendment privacy interest.[6]

---

[6] The DEA's contention that the federal government may obtain the state's prescription database on the grounds that disclosure to the state waives any privacy interest in the information, *see* Pet. at 26, n.12 (citing *United States v. Jacobsen*, 466 U.S. 109, 117 (1984)), is unfounded and inapplicable.  *Jacobsen* focused on whether the customer of a private shipping company had a privacy interest in a package provided to the shipping company after the company alerted law enforcement to the package.  466 U.S. at 117-18.  The case here, however, involves information held by a separate sovereign, the State of Colorado, to which enforceable privacy expectations attach and which have not been voluntarily waived. The DEA has not cited another case controlling on this point.

**E.** **_Whalen_ is not dispositive of Respondent's Fourth Amendment arguments.**

The DEA contends that the Supreme Court's decision in _Whalen_ is somehow dispositive of the patients' privacy interests in this case.  Pet. at 20-26.  However, _Whalen_ addressed patient privacy concerns under the Fourteenth Amendment, explicitly declining to address the issue under the Fourth Amendment.  _Whalen_, 429 U.S. at 603-04, n.32.

In _Whalen,_ the Court stated that the Fourth Amendment did not apply to New York's wholesale collection of prescription data.  _Id._ at 604, n.32.  Instead, the Court asserted that relevant Fourth Amendment case law was confined to "affirmative, unannounced, narrowly focused intrusions into individual privacy during the course of criminal investigations."  _Id._  In fact, the Court hardly contemplated the prospect that New York's data would be involved in the criminal process at all.  The Court succinctly stated that the data may be offered as evidence against a patient or a doctor in a judicial proceeding and that judicial supervision would adequately protect individuals' data in such circumstances.  _Id._ at 601-02.  The Court otherwise focused on the protections the government had put in place to try to prevent redisclosure of patients' information and found them to be satisfactory.  _Id._ at 602-04.

The situation here diverges from _Whalen_ in two key respects.  First, _Whalen_ did not envision another government agency using administrative subpoenas to obtain patient information for a criminal investigation outside the confines of judicial supervision.  Instead, the Court was primarily concerned with whether it was appropriate for the state to possess patients' prescription records on a computer database managed by the state.  _Id._ at 593-96.  But that is not in dispute in the present case.  Crucially, the Court was not presented with an actual intrusion into the sensitive data maintained on New York's prescription database, which was made clear

by the Court's rejection of a Fourth Amendment analysis.  *Id.* at 604, n.32.  Thus, *Whalen* holds

little precedential value in this case.

In contrast, *Oregon PDMP*'s analysis is particularly instructive on how a Fourth

Amendment analysis may have impacted *Whalen*'s persuasive value.  For example, when

considering the DEA's proffered protections on redisclosure, the court aptly stated:  "The DEA

argues that because there are privacy protocols within the DEA, and risk of public disclosure of

prescription information is low, there is no violation of patients' privacy interests.  The Fourth

Amendment was not designed to protect public disclosure of individuals' private information,

but to protect people from government intrusion." *Or. Prescription Drug Monitoring Program*,

998 F. Supp. 2d at 967, n.4.

Second, *Whalen* was decided in 1972 when computers had limited technological

capabilities relative to the modern age of computing.  In fact, in Justice Brennan's concurrence,

he was sensitive to how potential technological advances could impact the Court's reasoning,

particularly from a Fourth Amendment perspective, stating:

> What is more troubling about this scheme, however, is the central
> computer storage of the data thus collected. Obviously, as the State argues,
> collection and storage of data by the State that is in itself legitimate is not
> rendered unconstitutional simply because new technology makes the
> State's operations more efficient.  However, as the example of the Fourth
> Amendment shows the Constitution puts limits not only on the type of
> information the State may gather, but also on the means it may use to
> gather it.  The central storage and easy accessibility of computerized data
> vastly increase the potential for abuse of that information, and I am not
> prepared to say that future developments will not demonstrate the
> necessity of some curb on such technology.

*Id.* at 606-07 (Brennan, J., concurring).  As discussed above, the PDMP's aggregated, digitized

form of patients' prescription records calls for expanded protection of patients' identifying

information under the Fourth Amendment.  Rather than foreclose the State Respondent's Fourth

Amendment argument here, Justice Brennan's concurrence lends further support to the

proposition that patient privacy concerns should be reevaluated in the digital age.[7]

## II. The DEA's Justification for Why It Needs Patient Identifying Information for More Than 14,000 People Who Are Not the Subjects of Its Investigation Does Not Meet the "Reasonable Relevance" Test Under the Fourth Amendment.

The Supreme Court has definitively stated that when an administrative agency subpoenas

records, "the Fourth Amendment requires that the subpoena be sufficiently limited in scope,

relevant in purpose, and specific in directive so that compliance will not be unreasonably

burdensome." *See v. City of Seattle*, 387 U.S. 541, 545 (1967) (citing *United States v. Morton

Salt Co.*, 338 U.S. 632 (1950)) (citations omitted). This is commonly referred to as the

"reasonable relevance test" and has been applied to subpoenas in this Circuit. *Becker v. Kroll*,

494 F.3d 904, 916 (10th Cir. 2007); *see also United States v. Reno*, 522 F.2d 572, 575-76 (10th

Cir. 1975) (citing *United States v. Gurule*, 437 F.2d 239 (10th Cir. 1970) ("[The Supreme

Court's requirements] are: (1) that the subpoena command only the production of materials

relevant to the investigation; (2) that the subpoena specify the materials to be produced with

reasonable particularity; and (3) that the subpoena command production of materials covering

*only a reasonable period of time*.") (emphasis added)). Ordinarily, respondents bear the burden

of showing that an agency subpoena is unreasonable. *United States v. Donaldson*, 400 U.S. 517,

527 (1971); *United States v. Powell*, 379 U.S. 48, 58 (1964).

---

[7] The DEA cites to three Tenth Circuit cases for the proposition that, despite the fact that patients have a privacy interest in prescription records, the right is not absolute and the state can undermine it in some respects. Pet. at 22-23; *see also Pyle v. Woods*, 874 F.3d 1257 (10th Cir. 2017); *Kerns v. Bader*, 663 F.3d 1173 (10th Cir. 2011); *Douglas v. Dobbs*, 419 F.3d 1097 (10th Cir. 2005). Respondents agree that patients' privacy interests in prescription records may be abrogated in some respects. However, any such limitations must still comply with the protections afforded to patient identifying information in its aggregated, digitized form under the "reasonable relevance" test for the Fourth Amendment, as discussed in Section II, *infra*.

The State Respondents concede that the DEA's subpoenas are specific in directive. However, the subpoenas here fail the reasonable relevance test for two reasons. First, the DEA's request for patient identifying information is not reasonably relevant to an investigation of the targeted pharmacies. Second, the requests for *all* controlled substances over the course of *six years* makes no effort to limit the scope of the information sought to minimize the possible intrusion on patients' sensitive health information.

A.   **The DEA's requests for patient-identifying information is not "relevant in purpose" because the patients' identities are not germane to the investigation of the targeted pharmacies.**

When applying the reasonable relevance test, this Court should be mindful that administrative subpoenas directed at individuals' personal information implicate privacy rights. *In re McVane*, 44 F.3d 1127, 1137 (2d Cir. 1995) (citing *United States v. Harrington*, 388 F.2d 520, 524 (2d Cir. 1968) (noting that the "personal interest cannot be . . . blithely brushed aside")).

In *McVane*, the Federal Deposit Insurance Corporation ("FDIC") was investigating the former directors of a failed bank. 44 F.3d at 1130-31. As part of its investigation, the FDIC sought extensive personal financial records from the former directors as well as their family members (e.g. "all financial statements of your spouse"). *Id.* The circuit considered the reasonableness of the FDIC subpoena and concluded that the FDIC had failed to substantiate a reasonable need for the family members' records for use in its investigation of the directors. *Id.* at 1139. The circuit noted that the family members had a "greater 'reasonable expectation of privacy.'" *Id.* (quoting *Katz*, 389 U.S. at 360). The subpoenas therefore required a more exacting "intermediate" level of scrutiny than records for corporate directors who were subject to the investigation. *Id.* at 1138 (citing *Bertoldi v. Wachtler*, 952 F.2d 656, 659 (2d Cir. 1991) (government must show that the compelled disclosure is designed to further a substantial

governmental interest and is not unreasonable in scope)).  As a result, the FDIC was required to "make some showing of need for the material sought beyond its mere relevance to a proper investigation."  *Id.*  (internal quotation marks and citations omitted).

The FDIC claimed it needed the family members' records to see both sides of a transaction in case directors had transferred assets to their families.  The Second Circuit rejected this argument, finding that the FDIC failed to persuasively explain why its stated goals could not be accomplished through more narrowly drawn subpoenas.  *Id.* at 1139.  If familial documents were actually needed, then the FDIC could view transfers conducted by the directors from the sending side of the transaction.  *Id.*  The court noted that any future subpoena of familial documents "must be specified with greater precision."  *Id.*

In this light, the DEA in this case should be required to make some showing as to why every patient who filled a controlled substance prescription with the target pharmacies over the past six years should be subject to disclosure of their identities along with their sensitive health information.  Just as the two-step process outlined in *McVane* was deemed to be necessary under the Fourth Amendment, here too, the DEA can reasonably start with the de-identified prescription records submitted through the Wipf Declaration.  Should the DEA detect suspicious transactions in those records, it may then make follow-up requests that are "specified with greater precision" for the specific patient identities involved in the suspect transactions.

The DEA has provided a long list of reasons for why patient identifying information is of "critical importance" to its investigation of the subject pharmacies, all of which are found wanting.  Pet. at 11-12.  None of the purported justifications are reasonably relevant to its investigation of the pharmacies, particularly when compared to the massive intrusion into innocent patients' constitutionally protected privacy rights.

For example, the DEA first states that it uses patient information to "connect the dots" with other investigations or leads regarding patients or prescribers.  Pet. at 11.  Yet, if the DEA has already generated the names of suspected patients or prescribers, it could easily identify those individuals in a subpoena without intruding on the privacy interests of the majority of patients who are not engaged in criminal or other unlawful behavior.  Second, the DEA states patient identifying information helps it discern whether the pharmacies are exercising controls over improper dispensing.  *Id.*  However, the DEA fails to explain why that cannot be discerned from the pharmacies' transactions alone, without the true patient identities, and it ignores the fact that Colorado pharmacists are not generally required to check the PDMP prior to dispensing controlled substances.  (Nor, indeed, do the records sought in these subpoenas contain information on when a pharmacist queries its database.  *See* McGovern Decl. ¶ 10.)  Third, the DEA indicates it uses patient names to develop witnesses to interview.  *See* Pet. at 12.  Again, the DEA does not need the patient names at the outset where it could instead focus on potential witnesses by observing patterns of transactions and then seek the identifying information in more targeted requests based on such analysis.  Finally, the DEA prefers complete patient data to run through its digitized, comprehensive data analysis tools.  *Id.*  While the DEA may prefer the data in this format, it makes no showing as to how this actually furthers an investigation of the target pharmacies (as opposed to a fishing expedition for future investigations of patients) and, more importantly, this emphasizes the extreme intrusion into patients' privacy that the reasonable relevance test is meant to safeguard against.

In addition, HIPAA's comparable provisions for releasing confidential patients' records for law enforcement purposes provide useful context for evaluating the reasonableness of the DEA's request.  *See* 45 C.F.R. § 160.512(f).  Specifically, HIPAA permits covered entities to

disclose protected health information pursuant to an administrative subpoena, provided that the

following requirements are met:

> (1)     The information sought is relevant *and material* to a legitimate law
> enforcement inquiry.
>
> (2)     The request is specific and limited in scope to the extent
> reasonably practicable in light of the purpose for which the information is
> sought; and
>
> (3)     *De-identified information could not reasonably be used*.

*Id.* at § 150.512(f)(1)(ii)(C) (emphasis added).  While HIPAA is not applicable to the State

Respondents, the above requirements add further demands to what showing is required for law

enforcement access to health information.  Notably, law enforcement must demonstrate that the

sensitive patient information is "material" to its investigation and that "de-identified information

could not reasonably be used."

Finally, the DEA cites to a number of cases in an effort to persuade this Court to define

relevance more broadly, up to and including a "fishing expedition."  Pet. at 16-18.  However,

none of those cases touched upon a constitutional right of privacy akin to patient-identifying

health information.  In the healthcare sphere, the DEA only cites to *Becker v. Kroll*, 494 F.3d 904

(10th Cir. 2007), which upheld an administrative subpoena for a doctor's billing records over the

course of three years for 47 randomly selected patients pursuant to a Medicaid fraud

investigation.  Pet. at 18; *Becker*, 494 F.3d at 916-17.  This case is easily distinguished from the

present circumstances because the doctor never challenged whether the requested records were

reasonably relevant to a subpoena.  *Id.*  In fact, the doctor conceded the records' relevance and

only argued that the subpoena *also* had to be supported by probable cause.  *Id.*  The Tenth Circuit

did not address any patient privacy concerns and was not asked to do so.  *Id.* at 916-17.

**B.      The DEA's requests are not "sufficiently limited in scope" because they are not targeted in terms of medications or patients.**

The "reasonable relevance" test under *City of Seattle* requires that in addition to being relevant in purpose, the information sought by an administrative subpoena also must be "sufficiently limited in scope."  387 U.S. at 544.  In this context, the Court is called to examine the tailoring of the request, focusing on whether the administrative agency has sought more information than is required for its investigative purpose.  *See In re Grand Jury Subpoena Duces Tecum Issued on June 9, 1982*, 697 F2d 277, 281 (10th Cir. 1983).

Here, the prescription records for the more than 14,000 patients whose medications were dispensed over nearly six years encompass all manner of medications for which no law enforcement interest could possibly exist, nor has the DEA proffered any justification for such records.  For example, the responsive records submitted to the Court through the Wipf Declaration reveal that the DEA is seeking patient names for 5,774 prescriptions for Androgel or testosterone pills (for hormone replacement and sexual disorders), 5,022 prescriptions for Adderall or dextroamphetamine (for attention-deficit/hyperactivity disorder (ADHD), narcolepsy, and other brain disorders), 4,810 prescriptions for Alprazolam (for anxiety and panic disorders), 3,550 prescriptions for Clonazepam (for seizures and anxiety/panic disorders), and 936 prescriptions for Vyvanse (for binge-eating disorders).  *See* McGovern Decl. ¶¶ 29-31.  There is no showing by the DEA, and the State Respondents can imagine no rationale of their own, for why the DEA's investigations of these pharmacies requires the patient identities for these medications, none of which are opioid drugs.[8]

---

[8] Opioids are the only class of controlled substances that the DEA has specifically acknowledged it is investigating.  *See* Hamilton Decl. ¶¶ 7, 13, 22-23.

In addition, because the records produced by the Division maintain the actual zip code data listed in the prescription records, it is eminently feasible to narrow the set of data by location, a point that the DEA asserts is important to its investigation.  *See* Hamilton Decl. ¶ 28. Despite acknowledging the significance of location information, the DEA did not specify any particular zip code in its subpoena requests, nor did it exclude any.  As a result, the data sets for both pharmacies' records in this case include large numbers of patients who necessarily are within the ordinary market area of the pharmacy, and thus for which no suspicious geographic considerations would apply.  *See* McGovern Decl. ¶¶ 30-31.

In sum, the DEA's subpoenas are not reasonably relevant in either purpose or scope, and this Court therefore should not enforce the DEA's request for patient identifying information in connection with the more than 14,000 patients whose the PDMP records have been requested.[9]

## CONCLUSION

In light of the foregoing, the Court should deny the Petition and find that the submission of the de-identified, pseudonymized PDMP data in Exhibit 1 to the Wipf Declaration satisfies the subpoenas at issue in this matter.


DATED at Denver, Colorado this 6th day of December, 2019.


PHILIP J. WEISER
Colorado Attorney General

*/s/ Christopher P. Beall*
CHRISTOPHER P. BEALL
Deputy Attorney General

---

[9] As a separate matter, the DEA contends that any state law limitations on the disclosure of patient identifying information are preempted by the provisions of the Controlled Substances Act.  Pet. at 26-29.  State Respondents' arguments do not rely on state law and are solely confined to the parties' rights and responsibilities under the Fourth Amendment.

Pamela D. Jackson
Krista F. Batchelder
Robert C. Staley
Colorado Department of Law
1300 Broadway, 8th Floor
Denver, Colorado 80203
720-508-6413

Counsel for State Respondents
Colorado Board of Pharmacy and
Patty Salazar, Executive Director of the Colorado
Department of Regulatory Agencies