**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Miscellaneous Action No. 19-mc-00105-RM

UNITED STATES DEPARTMENT OF JUSTICE, DRUG ENFORCEMENT
ADMINISTRATION,

      Petitioner,

v.

STATE OF COLORADO BOARD OF PHARMACY,
PATTY SALAZAR, EXECUTIVE DIRECTOR OF THE COLORADO DEPARTMENT OF
REGULATORY AGENCIES, and
APPRISS, INC.,

      Respondents.

---

**REPLY BRIEF IN SUPPORT OF PETITION FOR EXPEDITED ORDER**
**ENFORCING ADMINISTRATIVE SUBPOENAS**

---

      This Petition is straightforward.  The DEA seeks to enforce subpoenas it issued in

connection with investigations of two pharmacies, seeking data those pharmacies had reported to

Colorado's Prescription Drug Monitoring Program (PDMP).  ECF No. 1 at 10-13.  State law

presents no obstacle to the disclosure of this PDMP data:  there is no dispute that Colorado's

PDMP statute provides that PDMP data may be disclosed to law enforcement in an investigation

of a pharmacy. *Id*. at 8, 26-29; ECF No. 18 at 31 n.9. [1]  As the DEA has explained, ECF No. 1 at

14-26, the DEA's subpoenas comply with the minimal constitutional standards for administrative

---

[1]     Where the DEA has cited the briefs filed by Appriss (ECF No. 17), the State (ECF No. 18), and the ACLU (ECF No. 24), the DEA has used the page references at the top right of each page, not the bottom.

subpoenas, and the DEA may constitutionally obtain data on prescriptions for controlled substances under the standards set forth in *Whalen v. Roe*, 429 U.S. 589 (1977).

In response, the State Respondents (the "State") make two arguments.

***First***, the State argues that it cannot produce the PDMP data to the DEA because to do so would violate the Fourth Amendment rights of patients. It argues for a new rule: that patients have a reasonable expectation of privacy that arises not in their controlled substance prescription drug records (which the State agrees may be lawfully obtained by the government from the pharmacy), but rather that arises only *after* those records are placed in a government database. ECF No. 18 at 13-25. Notably, however, the State does *not* argue that this Fourth Amendment analysis ultimately requires any higher standard than the standard ordinarily applied to administrative subpoenas. Rather, the State argues that the DEA "must satisfy the Fourth Amendment's 'reasonable relevance' test for administrative subpoenas." ECF No. 18 at 6. The parties thus agree that a "reasonable relevance" standard applies here.

***Second***, the State argues that the DEA cannot meet the "reasonable relevance" standard to the extent the DEA seeks the patient-identifying information that was included in the data the two pharmacies reported to the PDMP. ECF No. 18 at 25-31.

Neither of the State's arguments shows that the Court should not enforce the Petition. As an initial matter, the Court need not address the State's arguments on the exact nature of any Fourth Amendment privacy right that patients may have in the controlled substances data the pharmacies reported to the PDMP. Resolving this question does not appear necessary to resolve this Petition, since the State agree that the ordinary "reasonable relevance" standard applies.

If the Court nevertheless finds it appropriate to consider the State's arguments on the scope of patients' privacy rights in the PDMP data, the Court should rule that the Fourth Amendment does not bar the release of the data to the DEA, for several reasons:  (1) it is well established that the government may lawfully collect and use controlled substance prescription records for law enforcement purposes, and patients have no reasonable expectation of privacy that bars the government from obtaining such records; (2) once the State has lawfully obtained records, as all parties agree occurred here, the Fourth Amendment does not bar the State from disclosing those records to another governmental entity (the DEA); and (3) because the DEA's investigations are of the pharmacies, any incidental impact on the privacy interests of other parties (like the pharmacies' patients) does not violate the Fourth Amendment.

Finally, the State has not met its burden to show that the DEA's requests for the patient-identifying information—which is included in the data the pharmacies under investigation themselves reported to the PDMP—is not reasonably relevant to the DEA's investigation.  The State's suggested work-arounds—such as that the DEA should submit to the State the names of all individuals who might be under DEA investigation—are impractical and in any event do not show that the data sought is not relevant to the investigations.

I.      **The Court should apply the "reasonable relevance" test.**

As the DEA explained in the Petition, the standards for administrative subpoenas are well established.  The "constitutional requirements for administrative subpoenas" are that "'that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.'"  *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984) (quoting *See v. City of Seattle*, 387 U.S. 541, 544 (1967)).  The information sought

must be "reasonably relevant" to the investigation. *See* ECF No. 1 at 16-18 (discussing the broad meaning the Supreme Court has given to "relevance" in the context of administrative subpoenas).

The State agrees that the "reasonable relevance" standard applies to the subpoenas. The State argues that the patients whose records are at issue have a privacy interest in those records, but the State also makes clear that it agrees that the "reasonable relevance" test still applies. ECF No. 18 at 6 (to overcome the patient's privacy interest, "the DEA must satisfy the Fourth Amendment's 'reasonable relevance' test for administrative subpoenas"); *id*. at 12 ("to overcome the Fourth Amendment's privacy guarantee, the information requested by the DEA must meet the 'reasonable relevance' test"). Discussing cases cited by the DEA, the State explains that it "agree[s] that patient privacy interests in prescription records may be abrogated in some respects" but that the DEA must meet the "'reasonable relevance' test for the Fourth Amendment." ECF No. 18 at 25 n.7.

No other party seeks a different standard. The ACLU, as amicus, argues that if patients have a reasonable expectation of privacy in the records at issue, the Court should require "the DEA to proceed via search warrant instead of with an administrative subpoena." ECF No. 24 at 18. But the ACLU is not a party and has not sought intervention. As an amicus, the ACLU is not entitled to seek additional relief beyond that sought by a party, nor may it enlarge the issues, as the framing of the issues in a case is restricted to the parties. *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) (holding that an intervenor "must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing"); *United States v. Bd. of County Comm'n'ers of County of Otero*, 843 F.3d 1208, 1215

Case 1:19-mc-00105-RM   Document 26   Filed 12/23/19   USDC Colorado   Page 5 of 38

(10th Cir. 2016) (explaining that it would not consider an issue raised by an amicus because "that issue is not properly before us, because it has not been raised by a party" and citing *Tyler v. City of Manhattan*, 118 F.3d 1400, 1403 (10th Cir. 1997), for the proposition that the "framing of the issues" is "a prerogative more appropriately restricted to the litigants").

Because the parties agree that the "reasonable relevance" standard applies and that no warrant is required for PDMP records, the Court need not, and should not, consider any other Fourth Amendment issues raised by the State or the ACLU. Instead, the Court may appropriately skip directly to whether the "reasonable relevance" standard has been met (addressed in Section III below). Nevertheless, in the event that the Court wishes to consider the State's Fourth Amendment analysis, the DEA explains below why that analysis is incorrect.

## II. The Fourth Amendment does not bar the State from disclosing the PDMP records to the DEA.

If the Court decides to consider the State's argument regarding the Fourth Amendment rights of individuals whose records on controlled substances prescriptions has been collected in the PDMP, the Court should find that the Fourth Amendment does not prohibit the State from disclosing such records to the DEA, for multiple reasons.  First, in *Whalen v. Roe*, 429 U.S. 589 (1977), the Supreme Court held that the government may lawfully collect controlled substance prescription records for law enforcement purposes.  This principle was not overruled by the Supreme Court's decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018).  Second, once the State has lawfully obtained records, as all parties agree the State did here, the Fourth Amendment does not bar the State from then disclosing those records to another governmental entity (such as the DEA).  Third, because the DEA's investigations are of the pharmacies, any

incidental impact of the subpoenas on the privacy interests of other parties does not violate the Fourth Amendment.

A. *Whalen* held that the government may lawfully collect and use controlled substance prescription records for law enforcement purposes.

In *Whalen v. Roe*, 429 U.S. 589 (1977), the Supreme Court held that while patients have a privacy interest in controlled substance prescription records, the government still may lawfully collect those records, including for law enforcement purposes, so long as the government has provided reasonable safeguards against unwarranted public disclosure of those records.

The New York state statutory scheme at issue in *Whalen* was focused on law enforcement: its purpose was to prevent the diversion of controlled substances. 429 U.S. at 591-92. The state collected controlled substances prescription records and placed those records into its database, but did not disclose those records to any prescribers or pharmacists. *Id.* at 595 & n.12.

Considering and rejecting a broad privacy-based challenge to this scheme, the *Whalen* Court held that even though prescription records for controlled substances may contain sensitive information, the government still could obtain such records for law enforcement purposes.  The Court reasoned that (1) the government has a vital interest in obtaining prescription records to enforce controlled substances laws and ensure that controlled substances are not overdispensed or misused; (2) patients recognize that even sensitive health records often may be disclosed to the government; and (3) privacy concerns are diminished so long as there are protections against public disclosures.  ECF No. 1 at 20-26. These principles from *Whalen* have been reaffirmed in later decisions from the Supreme Court and Tenth Circuit.  ECF No. 1 at 20-24.

The State contends that *Whalen* is "not dispositive" here and suggests that the New York State prescription drug monitoring scheme at issue in *Whalen* was different from the Colorado PDMP "in two key respects."  ECF No. 18 at 23.  First, the State argues that the New York scheme in *Whalen* did not focus on whether the data collected might be used in law enforcement investigations.  ECF No. 18 at 23-24.  Second, the State argues that *Whalen* is of limited significance because the scheme for collecting records at issue in that case involved "limited technological capabilities." *Id.* at 24.  Neither argument shows that *Whalen* lacks force today.

First, the Court in *Whalen* expressly acknowledged that the prescription records reported to the state were for use in law-enforcement investigations.  The Court noted that the state statute permitted numerous law-enforcement disclosures, including to "24 investigators with authority to investigate cases of overdispensing," 429 U.S. at 595, pursuant to subpoena "in a criminal investigation or proceeding." *id.* at 595 n.12, and—without the need for any subpoena—"to an agency, department of government, or official board authorized to regulate, license or otherwise supervise a person who is authorized by this article to deal in controlled substances, or in the course of any investigation or proceeding by or before such agency, department or board," *id.* (quoting Section 3371 of the N.Y. Public Health Law).  The Court observed that the "patient-identification requirement might aid in the enforcement of laws designed to minimize the misuse of dangerous drugs" and that the patient reporting could "aid in the detection or investigation" of misuse.  *Id.* at 597-98. The *Whalen* Court thus expressly took into account that the database would be used for law enforcement purposes, but still rejected that such collection and use of controlled substances records violated any privacy interests found in the Constitution.

In conducting this analysis, the *Whalen* Court considered—and rejected—the argument that the statute violated the Fourth Amendment.  The Court noted that the plaintiff's privacy-based challenges to the statute relied on several constitutional grounds.  429 U.S. at 598-99 & n.23, 604 n.32.  In rejecting the plaintiffs' Fourth Amendment argument, the Court explained that it "ha[d] never carried the Fourth Amendment's interest in privacy as far as the [challengers] would have us." *Id.* & 604 n.32.  It explained that the statutory scheme—involving the collection of prescription records from third parties for law enforcement to use in investigating misuse of controlled substances—did not "involve affirmative, unannounced, narrowly focused intrusions into individual privacy" such as those in *Terry v. Ohio* and *Katz v. United States*.[2]  In sum, the *Whalen* Court recognized that the government could obtain and use controlled substances prescriptions records for law enforcement purposes, and held that obtaining and using such records did not violate the patients' constitutional privacy interests.

Second, the Court in *Whalen* expressly recognized that the patient data would not be merely collected, but would be aggregated in large computer files for later use by the government.  The Court explained that the "constitutional question presented" was whether the state "may record, in a centralized computer file, the names and addresses of all persons who have obtained, pursuant to a doctor's prescription, certain drugs for which there is both a lawful and an unlawful market." 429 U.S. at 591.  It noted that the information was "sorted, coded, and logged." *Id.* at 593.  It stressed that it was "not unaware of the threat to privacy implicit in the

---

[2]    In citing *Katz*—which had adopted the "reasonable expectation of privacy" test—the *Whalen* Court indicated that it rejected the notion that individuals had a reasonable expectation of privacy that prevented the government from collecting and using prescription records relating to controlled substances, including for law enforcement purposes.

accumulation of vast amounts of personal information in computerized data banks or other

massive government files." *Id*. at 605.

The Court concluded that this collection of controlled substances records, and

accompanying law enforcement access to those records, was lawful. The Court noted that the

State had a "vital interest in controlling the distribution of dangerous drugs." *Id*. at 598. It also

noted that patients often have limited privacy in matters involving health. For example, it

explained that there are a "host of other unpleasant invasions of privacy that are associated with

many facets of health care." 429 U.S. at 602. It observed that patients may expect disclosures of

their health information to variety of parties "even when the disclosure may reflect unfavorably

on the character of the patient." 429 U.S. at 602. It noted, for example, that there are statutory

reporting requirements for medical matters such as venereal disease and child abuse. 429 U.S.

at 603 & n.29. The Court found, however, that the statutory scheme would not deprive persons

of access to the medications. *See id.* at 603.

The Court concluded that disclosures of these controlled substance prescription records to

the government—including to law enforcement in computerized format—were proper so long as

the patient's privacy would be protected from unwarranted disclosures. The Court focused on

the unwarranted *public* disclosure of private information—"that the information will become

publicly known and that it will adversely affect their reputations." 429 U.S. at 600.

This emphasis on unwarranted public disclosure was highlighted again when the

Supreme Court reaffirmed *Whalen* in *NASA v. Nelson*, 562 U.S. 134 (2011). In *Nelson*, the

Court recognized that *Whalen* had permitted certain disclosures of controlled substances

prescription records but had concluded that those disclosures did not violate the Constitution:

> [T]he Court in *Whalen* and *Nixon* referred approvingly to statutory or regulatory protections against '*unwarranted* disclosures' and '*undue* dissemination' of personal information collected by the Government. ... Neither case suggested that an ironclad disclosure bar is needed to satisfy privacy interests that may be 'root[ed] in the Constitution.' *Whalen, supra,* at 605. In *Whalen,* the New York statute prohibiting '[p]ublic disclosure of the identity of patients' was itself subject to several exceptions.

*Nelson*, 562 U.S. at 157.

The Tenth Circuit, in finding a privacy interest in prescription records for controlled substances, has traced the lineage of this interest to the privacy right recognized in *Whalen*. *See Douglas v. Dobbs*, 419 F.3d 1097, 1101 (10th Cir. 2005). In *Douglas*, the Tenth Circuit, while recognizing a privacy right in records of prescription drugs for controlled substances, abided by *Whalen*'s recognition[3] that this privacy right can be "diminish[ed]" and may permit disclosures to law enforcement. *See id.* at 1102 n.3 (observing that "[t]his right to privacy is not absolute"

---

[3]     The ACLU cites *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), as finding an expectation of privacy for patients undergoing diagnostic tests in a hospital (ECF No. 24 at 12-13), but nothing in *Ferguson* suggests that the Supreme Court abandoned its prior holding in *Whalen* that the government may obtain access to records of prescriptions for controlled substances. In *Ferguson*, the Court held that where state hospital employees gave pregnant mothers urine tests for cocaine, without their consent and without "even the basis for a reasonable suspicion" that these patients were using cocaine, and then provided the results to law enforcement, the collections of the urine samples by the state hospital employees were "suspicionless searches" and violated the Fourth Amendment. *Id.* at 77, 86. The Court in *Ferguson* thus disapproved of a program of suspicionless, nonconsensual drug tests, but it did not cast any doubt on *Whalen*'s prior holding regarding access to controlled substances prescription records. Nor did *Ferguson* even establish that patients have a reasonable expectation of privacy in medical records. *See Kerns v. Bader*, 663 F.3d 1173, 1185 (10th Cir. 2011) (observing that "Professor Lafave has explained that *Ferguson* cannot be taken as having disapprov[ed] of the result in cases applying the third party doctrine to medical records and finding no Fourth Amendment violation where (as here) a law enforcement officer seeks medical records held by third party care givers") (internal quotation marks omitted).

and "state law can operate to diminish the expectation in prescription drug records" such as where the state provides for making "these records available to law enforcement").

Accordingly, under *Whalen* and *Nelson*, law enforcement may obtain access to controlled substances prescription records, so long as there are safeguards against unwarranted public disclosures.  The DEA explained in the Petition the various safeguards against such disclosures here, *see* ECF No. 1 at 25-26, and the State has not identified any inadequacy in those safeguards.  As a result, the sharing of the PDMP records, as expressly permitted by state law, is proper under *Whalen* even if patients have a privacy right in those records.

### B.    *Carpenter* did not change this approach.

The State and the ACLU argue that the Supreme Court's decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), supports a ruling that there is now a reasonable expectation of privacy such that PDMP records may not be disclosed to law enforcement (but prescription records themselves may continue to be obtained by the government in the first instance without offending the Fourth Amendment).  *See* ECF No. 18 at 16, 19-22; ECF No. 24 at 19-21, 23.

But *Carpenter* does not support finding a new reasonable expectation of privacy in controlled substances prescription records, as can be seen in multiple ways.  First, the cell-site location information at issue in *Carpenter*, unlike the controlled substance prescription records here, amounted to constant, near-perfect surveillance.  Second, *Carpenter* affirmed that administrative subpoenas generally remain subject to the same lenient standards.  Third, nothing in *Carpenter* suggests that society would recognize that patients have a reasonable expectation of privacy in records of prescriptions for controlled substances, especially those records that are already in the possession of the government.

      **1.**      **The data in *Carpenter* amounts to constant surveillance, unlike prescription records for controlled substances.**

In *Carpenter*, the Supreme Court held that individuals have a reasonable expectation of privacy in the extensive cell-site location information (CSLI) that their cell phones automatically send to wireless providers, and the government needs a warrant to obtain this CSLI for a suspect. 138 S. Ct. at 2210, 2222.

The Court made clear that its holding was limited to the unique nature of CSLI, which the Court explained "is an entirely different species of business record." *Id*. at 2222. It explained that CSLI provides an "all-encompassing record of the holder's whereabouts," which "tracks nearly exactly the movements of its owner," and "achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id.* at 2217-18. Moreover, this data is automatically and continually logged, providing a "detailed chronicle of a person's physical presence compiled every day, every moment, over several years." *Id.* at 2220.

Nothing in *Carpenter* suggests that similar concerns of constant "near perfect surveillance" are presented by the far narrower set of controlled substances records the DEA seeks here, which may involve only handful of prescription records relating to each individual. Indeed, the DEA subpoenas seek only a small subset of prescription records a patient may have: only for prescriptions that are for controlled substances, and only those filled at the two pharmacies under investigation. The records the DEA seeks thus are not even an "all-encompassing" list of all the prescriptions any individual patient may have. Nor is this list extensive: based on the State's representations regarding the data, there may be an average of only about a dozen prescriptions per individual, and many prescriptions may be for the same drug, offering even less information.

### 2.    *Carpenter* confirmed that the usual standards for administrative subpoenas still ordinarily apply.

The Court in *Carpenter* also confirmed that its decision was "a narrow one." 138 S. Ct. at 2222.  It stressed that "[t]he Government will be able to use subpoenas to acquire records in the overwhelming majority of investigations." *Id.*

In particular, *Carpenter* did not abrogate the third-party doctrine, under which individuals generally have no reasonable expectation of privacy in materials provided to third parties. *See United States v. Miller*, 425 U.S. 435, 443 (1976) (finding that depositors had no legitimate expectation of privacy in their financial records held by a bank because "[t]he depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the government," even "if the information is revealed on the assumption that it will be used only for a limited purpose"); *Smith v. Maryland*, 442 U.S. 735, 740 (1979)  (no expectation of privacy in records of dialed telephone numbers conveyed to telephone company).  As the Court explained in *Carpenter*, "The third-party doctrine partly stems from the notion that an individual has a reduced expectation of privacy in information knowingly shared with another."  138 S. Ct. at 2219 (internal quotation marks omitted).

The *Carpenter* Court stated, "We do not disturb the application of *Smith* and *Miller*…." 138 S. Ct. at 2220.  And it suggested that *Smith* and *Miller* could still apply where a third party acquires an individual's information only after some affirmative act by the individual.  The Court observed that with CSLI, the cell phone provider acquired the CSLI without any affirmative act by the individual:  CSLI "is not truly 'shared' as one normally understands the term," because "a cell phone logs a cell-site record by dint of its operation, without any affirmative act on the part of the user beyond powering up."  138 S. Ct. at 2220.  *Carpenter* thus may not apply where a

third-party record is created only after individual's affirmative act.[4] *See, e.g., United States v. Morel*, 922 F.3d 1, 9 (1st Cir. 2019) (holding that *Carpenter* did not apply to IP addresses as "unlike CSLI, an internet user generates the IP address data … only by making the *affirmative decision* to access a website or application") (internal quotation marks and citations omitted) (emphasis added).  Here, a pharmacy's prescription record is generated by a knowing and affirmative act on the part of the patient who must presents a prescription to the pharmacy in order to purchase the controlled substance.

### 3.    *Carpenter* did not suggest that society has recognized a reasonable expectation of privacy in records about controlled substances.

Finally, the Court in *Carpenter* did not abandon the longstanding rule that no reasonable expectation of privacy can exist unless "society [is] willing to recognize that expectation as reasonable…"  *California v. Ciraolo*, 476 U.S. 207, 211 (1986).  Many factors indicate that society has not recognized that individuals have a reasonable expectation of privacy (such that the government cannot obtain the information without a warrant) in records relating to the dangerous, oft-abused category of drugs classified as controlled substances.

For a half century, the DEA has been charged by law, in the Comprehensive Drug Abuse Prevention and Control Act of 1970 (commonly referred to as the "Controlled Substances Act" or the "CSA"), with the authority to track and monitor the distribution of controlled substances from manufacturer to the patient.  "[T]he expectation created by the CSA is that the prescription and use of controlled substances will happen under the watchful eye of the federal government."

---

[4] The ACLU's "voluntary" analysis omits these two crucial components: whether the patient knowingly and affirmatively presented the prescription to the pharmacy. In contrast, the *Carpenter* Court's analysis focused on how cell site data was collected without any affirmative act and without the user knowing what information had been collected.

*U.S. Dep't of Justice v. Utah Dep't of Commerce*, Case No. 2:16-cv-611-DN-DBP, 2017 WL 3189868, at *8 (D. Utah July 27, 2017) (finding no reasonable expectation of privacy in records of prescriptions for controlled substances).  In fact, Congress has made it unlawful for pharmacies that dispense controlled substances to refuse to furnish their dispensing information to the DEA on request.[5]  21 U.S.C. § 842(a)(5).  It makes little sense that the DEA could obtain dispensing records (with patient information) directly from a pharmacy it is investigating without violating the Fourth Amendment but an expectation of privacy would prevent it from obtaining that same information from the State.

Moreover, courts have recognized that pharmacies should be viewed under the Fourth Amendment as closely regulated businesses.  *See United States v. Jamieson–McKames Pharms., Inc.,* 651 F.2d 532 (8th Cir. 1981); *United States v. Argent Chem. Labs., Inc.,* 93 F.3d 572 (9th Cir. 1996); *United States v. Acklen,* 690 F.2d 70, 75 (6th Cir. 1982).  This recognition means that pharmacies' records are always subject to inspection, which in turn weighs against finding an individual expectation of privacy in pharmacy records.  *United States v. Biswell,* 406 U.S. 311, 316 (1972) ("[w]hen a dealer chooses to engage in [a] pervasively regulated business … he does so with the knowledge that his business records … will be subject to effective inspection").

Colorado's PDMP scheme further weighs against finding that patients have a societally recognized reasonable expectation of privacy in records of their prescriptions for controlled substances.  As discussed above, the State requires that pharmacies report all such data to the

---

[5]     The DEA could lawfully obtain data directly from the pharmacies based on an administrative subpoena or inspection of the pharmacy, but the DEA is seeking the information here from the PDMP directly to preserve the confidentiality of the investigations and for various other investigative reasons.  ECF No. 1 at 4 n.2, 9-10.

PDMP, Colo. Rev. Stat. § 12-280-403(1); provides that the Pharmacy Board may aggregate and

analyze the data and disclose it to a variety of other recipients, including law enforcement, *id.* §

12-280-404(3); and provides that practitioners and pharmacies must warn patients that the

information will be reported to the State and then may be further disclosed as provided in the

statute (including disclosures to law enforcement), *id.* § 12-280-403(3).  While the Court in

*Carpenter* found an expectation of privacy for records held by a *private* party, it did not suggest

any similar reasonable expectation of privacy would likely apply to information that individuals

know is regularly being provided directly to a government database for law enforcement

purposes, among other uses.  In sum, the prescription records at issue are dramatically different

from the CSLI that the Court in *Carpenter* found amounted to near-perfect surveillance.

Finally, nothing in *Carpenter* suggests that it was overruling *Whalen*. This Court should

conclude that *Whalen* still applies and permits the disclosure of controlled substances records so

long as there are safeguards against the unwarranted public disclosure of those records.

**B.      Once the State lawfully collected the prescription records, the Fourth
          Amendment does not prohibit disclosure of those records to the DEA.**

Another reason that the Fourth Amendment does not bar disclosure of the PDMP records

to the DEA is that those records are already in government hands.  The Fourth Amendment

focuses on government intrusions, not the sharing between government agencies of records

already in the government's possession.

No party in this proceeding challenges the State's original collection of this data on

patient prescriptions for controlled substances, or suggests that Colorado did not lawfully obtain

the records the DEA seeks.  The DEA observed that the State "lawfully obtained access to that

information," ECF No. 1 at 26 n.12, and this point is not contested by the State, ECF No. 18 at

23 (explaining that the lawfulness of the State's collection of the data "is not in dispute"), or by

the amicus, ECF No. 24 at 17 (conceding that the Supreme Court's decision in *Whalen* would

control whether the "State of Colorado could permissibly collect prescription records in its

secure public health database in the first instance" but observing that this collection is "not the

subject of the instant dispute").

This moment of intrusion of patient privacy that no party challenges—the State's

collection of the patient's data—would be the focus of any Fourth Amendment inquiry into

whether a patient's privacy rights were disturbed. Any violation of the Fourth Amendment "is

'fully accomplished' at the time of an unreasonable government intrusion." *United States v.*

*Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) (explaining that where property was searched in

Mexico, "if there were a constitutional violation, it occurred *solely* in Mexico," not in a later

proceeding). For example, where federal law enforcement proceedings involve an earlier

intrusion by state officials, the focus of the Fourth Amendment inquiry is on the earlier intrusion.

*See Elkins v. United States*, 364 U.S. 206, 222-23 (1960) (holding that evidence is inadmissible

in a federal criminal trial if it was earlier obtained unlawfully by state officers).

Once a patient's privacy interest in records of prescriptions for controlled substances was

disturbed by having that data transmitted to the State, any further disclosures by the State to the

DEA do not implicate or violate the Fourth Amendment. "The Fourth Amendment is implicated

only if the authorities use information with respect to which the expectation of privacy has not

already been frustrated." *United States v. Jacobsen*, 466 U.S. 109, 117 (1984). "Once

frustration of the original expectation of privacy occurs," the Fourth Amendment "does not

prohibit governmental use" of the information whose privacy was already disturbed. *Id.* at 117.

Courts have thus repeatedly recognized that once information has been lawfully collected by a government agency, no additional Fourth Amendment inquiry is required when that government agency later disseminates the information to another. *See, e.g., Hell's Angels Motorcycle Corp. v. McKinley*, 360 F.3d 930, 934 (9th Cir. 2004) (holding that a federal administrative subpoena for possession lawfully seized by police did not violate the Fourth Amendment because, once in possession of the government, the plaintiff had no reasonable expectation of privacy in the materials); *Jabara v. Webster*, 691 F.2d 272, 279 (6th Cir. 1982) ("We do not believe that an expectation that information lawfully in the possession of a government agency will not be disseminated, without a warrant, to another government agency is an expectation that society is prepared to recognize as reasonable."); *United States v. Hearst*, 563 F.2d 1331, 1347 (9th Cir. 1977) ("We decline to mutate the prohibitions of the Fourth Amendment, which deal with government-instigated searches and seizures, into a code of regulations governing interagency transfer of evidence legitimately in government control.").

Similarly, courts have held that no additional Fourth Amendment inquiry is required when a government official reviews records that the government previously obtained. *See, e.g., United States v. Muhtorov*, 187 F. Supp. 3d 1240, 1256 (D. Colo. 2015) ("Accessing stored records in a database legitimately acquired is not a search in the context of the Fourth Amendment because there is no reasonable expectation of privacy in that information. Evidence obtained legally by one police agency may be shared with similar agencies without the need for obtaining a warrant, even if sought to be used for an entirely different purpose."); *United States v. Mitchell*, 652 F.3d 387, 411 n.21 (3d Cir. 2011) ("Accessing . . . fingerprint or DNA databases does not independently implicate the Fourth Amendment."); *Boroian v. Mueller*, 616 F.3d 60, 62

(1st Cir. 2010) (holding that "the retention and matching of [a suspect's] lawfully obtained profile against other profiles in the government database … does not constitute a search within the meaning of the Fourth Amendment"); *Johnson v. Quander*, 440 F.3d 489, 498-99 (D.C. Cir. 2006) (holding that accessing DNA records already properly collected and stored in a database is not a search for Fourth Amendment purposes).  As the *Quander* court observed, "[p]olice departments across the country could face an intolerable burden if every 'search' of an ordinary fingerprint database were subject to Fourth Amendment challenges."  *Id*. at 498-99.

The same rule applies here, where the Colorado PDMP statute provides that once prescription drug records for controlled substances have been collected by PDMP, those records may be further disclosed for certain purposes, including to law enforcement engaged in a bona fide investigation of a pharmacy.[6]  ECF No. 1 at 6-9, 26-29.  And the PDMP statute requires that patients be warned twice—by both their prescribing practitioner and their pharmacy—that records of their prescriptions for controlled substances are being reported to the State and could be further disclosed as provided in the statute (which includes to law enforcement). Colo. Rev. Stat. § 12-280-403(3).  Thus, not only are the patients made aware that their records are transmitted to the government, they are made aware that the records may be provided to law enforcement.  There is no reason to believe that a reasonable expectation of privacy arose *after* the State lawfully collected these records in the first instance.

---

[6] The State does not dispute that the PMDP statute provides for release to law enforcement for investigation of a pharmacy.  *Cf.* ECF No. 18 at 31 n.9 (explaining that the State's objections to the DEA subpoena "do not rely on state law and are solely confined to the parties' rights and responsibilities under the Fourth Amendment")

The DEA's subpoena to the State thus does not implicate or violate the Fourth Amendment. Any privacy interest patients had in that information was disturbed when the State originally collected that information, but that original collection is not at issue in this proceeding.

### C.     Because the investigations are of the pharmacies, any incidental impact on the privacy rights of others does not violate the Fourth Amendment.

Yet another problem with the State's (and the ACLU's) Fourth Amendment analysis is that it focuses not on the subjects of the investigations—the *pharmacies*—but on third parties whose interests are only incidentally affected.

When an agency issues an administrative subpoena to investigate a company, that subpoena is proper even if the disclosure may have an "incidental effect" on the privacy rights of third parties who are not the subject of the investigation. For example, in *Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310 (1985), the Supreme Court observed that if an IRS summons were issued to a company under investigation where the records sought could shed light on other taxpayers, "any incidental effect on the privacy rights of unnamed taxpayers is justified by the IRS's interest in enforcing the tax laws." *Id*. at 321.

The proper focus under the Fourth Amendment is thus on the reasonableness of the subpoena as to the party being investigated. For example, in *Becker v. Kroll*, 494 F.3d 904 (10th Cir. 2007), the Tenth Circuit held that where, in an investigation of a doctor, the government issued a subpoena for the records for "forty-seven randomly-selected patients between 1995 and 1998," the subpoena met the "minimal standards for Fourth Amendment reasonableness" because "the records sought were relevant to the [agency's] investigation of potential up-coding." *Id*. at 909, 917. The State argues that *Becker* is not useful precedent here because the court did not consider the *patients'* privacy interests, ECF No. 18 at 29, but this argument is

misplaced:  because the subpoena was issued in the investigation of the doctor, the court properly evaluated the subpoena by focusing on whether the materials sought were relevant to that investigation of the *doctor*.  *Id.* at 917.

Thus, in evaluating an administrative subpoena, the Fourth Amendment focus is on the privacy rights of the party under investigation, not third parties who may be incidentally affected. This principle was recognized by the Supreme Court in *Carpenter*, 138 S. Ct. at 2222, where the Court explained that a warrant is required where "the *suspect* has a legitimate privacy interest in records held by a third party."  *Id.* (emphasis added).  The *Carpenter* Court did not suggest that in an investigation of a *suspect*, any subpoena would be infirm if it affected *any* third party who was not the focus of the investigation but who had a privacy interest in the records.

A contrary rule—where incidental effects on the privacy interests of third parties would violate the Fourth Amendment—would permit corporate entities to evade investigation into their own unlawful conduct, as they could resist productions by citing the privacy of their clients. Moreover, if parties could object whenever they believed their own privacy rights were at stake, they could substantially impede any investigation.  The Supreme Court has explained that allowing a party to challenge each investigative step by an agency would "stultify [the agency's] every investigative move."  *Donaldson v. United States*, 400 U.S. 517, 531 (1971) (holding that a taxpayer under investigation could not intervene to object to an IRS summons issued to another party, and suggesting that a contrary result would "stultify enforcement of federal law").

Here, the State asks the Court to consider the privacy rights of the patients whose records were previously provided to the PDMP by their pharmacies,[7] but those patient's rights do not prevent the disclosure of the PDMP data to the DEA because those patients' interests are affected only incidentally in the DEA investigations of two pharmacies.  And the State does not suggest that the pharmacies themselves have any privacy rights to invoke, nor do that, as it is a violation of law for a registered pharmacy to dispense controlled substances to refuse to provide the DEA with information it seeks.  21 U.S.C. § 842(a)(5) (making it unlawful for a registrant to "refuse … to … furnish any … information … required under this subchapter").

**D.     Other reasons weigh against addressing the State's arguments about the Fourth Amendment analysis of privacy interests in the PDMP records.**

As explained earlier, the State agrees that the "reasonable relevance" test applies here, so the Court need not address arguments about the scope of any Fourth Amendment rights of patients whose prescriptions for controlled substances were reported to the PDMP by the pharmacies under investigation.  But several other reasons further counsel against this Court addressing the State's arguments about the rights of those patients.

---

[7]     Another reason the patients lack a Fourth Amendment interest in the PDMP records is that those patients provided their information to a pharmacy, which in turn provided those records to the State.  Under the third-party doctrine, "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed."  *United States v. Miller*, 425 U.S. 435, 443 (1976).  This principle remains valid:  although the Supreme Court in *Carpenter* did not apply this doctrine to cell-site location information, the Court confirmed that it did "not disturb the application of … *Miller*."  138 S. Ct. at 2220.  Here, the patients' prescription information was provided to at least two third parties—first to the pharmacy, and then to the State. Thus, under the third-party doctrine, providing the PDMP information sought to the DEA would not violate the Fourth Amendment rights of any patients.

First, those patients are not parties here.  As the ACLU notes, whether another party has standing to stand in for absent third parties depends on whether those third parties could bring their own legal challenge.  ECF No. 24 at 6-9.  The Supreme Court has held that there are two reasons why federal courts should "hesitate before resolving a controversy, even within their constitutional power to resolve, on the basis of the rights of third parties not parties to the litigation."  *Singleton v. Wulff*, 428 U.S. 106, 113 (1976).  First, courts "should not adjudicate such rights unnecessarily."  *Id*.  Second, "third parties themselves usually will be the best proponents of their own rights."  *Id.* at 113-14.

Those reasons weigh against having the State seek to represent the interests of absent patients.  Patients whose records are collected by the Colorado PDMP do not lack an avenue to challenge any intrusion on their privacy.  Patients are informed that their records are collected, and reported by their pharmacy to the PDMP, and may be disclosed for various purposes including for law enforcement investigations.  These patients could bring their own legal challenge to the collection of that information by the State.  Such a challenge would appear likely to fail, *see Whalen v. Roe*, 429 U.S. 589 (1977), but that does not mean that the patients lack the ability to bring their own challenge.

The patients here are thus unlike the other individuals in the host of cases cited by the ACLU, where individuals' information was held by private parties that then later received a government request for the information.  *See* ECF No. 24 at 7-8.  In those cases, it was not clear that an employee had any way to sue an employer, or a patient to sue a doctor, or a minor to sue a video game distributor, on the speculative concern that some future government subpoena might request private records about the individual from their employer or doctor or distributor.

But here, patients are told of the collection of their records by the State for various uses, and they have a direct way to vindicate their interests.  It thus is not necessary for this Court to resolve here those patients' privacy concerns in a case where they are not parties and where their privacy rights have already been disturbed by the State before the DEA requested the information.

Other reasons further weigh against addressing in detail the State's arguments about the Fourth Amendment rights of patients.  It is not clear that the State may stand in for the interests of patients in this proceeding, as states generally cannot act as *parens patriae* for their citizens in their relations with the federal government.  *See Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923) ("[I]t is not part of [a state's] duty or power to enforce [its citizens'] rights in respect of their relations with the Federal Government."); *Massachusetts v. EPA*, 549 U.S. 497, 520 & n.17, 539 (2007) (explaining that while the *Mellon* bar allows a state to assert its own sovereign interests, it prohibits a state from acting as *parens patriae* to "protect her citizens from the operation of federal statutes"); *Government of Manitoba v. Bernhardt*, 923 F.3d 173, 179-83 (D.C. Cir. 2019) (applying the "*Mellon* bar" to find that a state could not act as *parens patriae* in a dispute with the federal government).

In addition, the State's interests here do not neatly align with the interests of the patients.  By collecting the records at issue, the State is the party that originally disturbs the patient's privacy.  And the General Assembly has provided that one purpose of the PDMP is to promote investigations of individual patients.  ECF No. 1 at 7-8.

In sum, the parties agree on the "reasonable relevance" standard to be applied, and the Court has many reasons not to delve into the State's arguments about the privacy rights of patients in their controlled substances prescription records.

**III.      The subpoenas satisfy the reasonable relevance test.**

The DEA's subpoenas are valid because they meet the "reasonable relevance" test.  As explained below, the information the DEA seeks is relevant to the investigations.

**A.      The subpoenas are proper if they relate to the investigation.**

The State acknowledges that it has the burden to show that the subpoena is not reasonably relevant to the DEA's investigation.  ECF No. 18 at 20.  Here, that burden is a heavy one.  First, as the DEA has explained, relevance has a broader meaning in the context of an investigation than in litigation, as an agency in an investigation has the authority to simply inquire.  ECF No. 1 at 16-18.

Second, an agency can define the scope of its investigation, and a subpoena is proper so long as it has at least one proper purpose—even if other purposes are shown to be improper.  *See Donaldson v. United States*, 400 U.S. 517, 532–33 (1971) (holding that a taxpayer could object that the IRS sought records for an improper purpose only if that improper purpose was the investigation's sole object); *FTC v. Carter*, 636 F.2d 781, 789 (D.C. Cir. 1980) (observing that *Donaldson* held "that even if an improper purpose by an agency or member of the staff is shown, enforcement of the subpoena is called for so long as proper purposes exist as well").

Here, the DEA's subpoenas directly relate to the pharmacies under investigation.  This case is thus unlike the unusual situation presented in *In re McVane*, 44 F.3d 1127 (2d Cir. 1995), relied on by the State.  ECF No. 18 at 26-27.  In *McVane*, the FDIC issued a request for records expressly focused on the family members of the investigation's targets, seeking "personal records from individuals who are married to or are immediate family members of the targets of an FDIC investigation."  44 F.3d at 1137.  The Second Circuit held that because the investigative

25

subpoenas were issued to individuals "whose connection to the investigation consists *only* of their family ties to corporate participants," the subpoenas to family members "must face more exacting scrutiny" than other administrative subpoenas.  *Id*. at 1138 (emphasis added).  But the court in *McVane* did *not* suggest that any elevated relevance standard would apply to subpoenas seeking records relating to the targets themselves.  *Id*. at 1138 & n.3 (explaining that while the subpoenas directed exclusively to family members warranted additional scrutiny, this elevated standard would *not* apply to requests relating directly to the targets, but that "the standard to be applied … is that set out in *Morton Salt* and its progeny").[8]

**B.      The data the DEA seeks is reasonably related to the investigations.**

The data the DEA seeks here—the data the pharmacies reported to the PDMP, including patient-identifying information—is reasonably related to the investigations of the pharmacies.

As explained in the Petition, the DEA's investigations of the two pharmacies focus on their dispensing of controlled substances to patients.  ECF No. 1-1 (Hamilton Decl.) at 3-5, ¶¶ 7-14.  These investigations are not, as the State incorrectly states (ECF No. 18 at 30 n.8), limited to the dispensing of opioids.  Hamilton Decl. ¶¶ 7-14.  They extend to all controlled substances, which by definition have the potential for abuse and dependence. 21 U.S.C. § 812(b).

A wide range of factors are relevant in these investigations of the pharmacies.  Such investigations may lead to administrative, civil, or criminal action, and may require consideration of a range of factors, including not just whether the dispensing conduct was improper but how

---

[8]       As to the requests that sought information relating directly to the targets, the *McVane* court noted that those requests were sufficient so long as the FDIC had at least one valid purpose for each request.  *McVane*, 44 F.3d at 1139 ("Even if the [targets] can show that one purpose underlying the subpoenas is improper, enforcement of the subpoenas is called for nonetheless so long as other, proper purposes exist.").

that conduct affected the public. The DEA may modify, suspend, or revoke a pharmacy's

registration if the pharmacy has engaged in conduct that is "inconsistent with the public interest,"

21 U.S.C. § 824(a)(4), or "which may threaten the public health and safety." 21 U.S.C. § 823(f).

Certain unlawful conduct may lead to criminal penalties. 21 U.S.C. § 841(a)(1) (providing for

criminal penalties for conduct relating to dispensing). Other improper dispensing conduct may

lead to civil penalties, where the amount of the monetary penalty depends in part on whether the

pharmacy's conduct resulted in public harm. *See* 21 U.S.C. § 842(c)(1)(A) (providing for civil

penalties for certain conduct); *Advance Pharmaceutical Inc. v. United States*, 391 F.3d 377, 399

(2d Cir. 2004) (discussing the factors considered in determining a civil penalty). For example, if

improper dispensing led to trafficking in controlled substances, or led to overdose or death, those

would be relevant matters for the DEA to consider.

In investigating pharmacies, it is useful for the DEA to obtain the information those

pharmacies themselves reported to the PDMP. *See generally* ECF No. 1-1 (Hamilton Decl.) at 5-

8, ¶¶ 15-24 (discussing several ways the PDMP data aids in DEA investigations of a pharmacy).

As the DEA has observed (ECF No. 1 at 26-29), the state statute requires disclosure of the

PDMP data in response to a law enforcement subpoena issued in an investigation of a pharmacy.

The State does not dispute that the statute provides for such disclosure, nor does it suggest that

the state statute provides any bar to disclosure of patient information. ECF No. 18 at 31 n.9.

**C.     The patient-identifying information is relevant to the investigations.**

The DEA has identified a plethora of ways in which obtaining patient-identifying

information can help advance investigations of pharmacies. See ECF No. 1-1 at 8-10, ¶¶ 25-31.

As explained above, *any one* of these reasons, if reasonable and relevant, is enough to show that the DEA's request for this data is proper under the law.

*First*, obtaining patient-specific information allows the DEA to connect the dots between patients and other information in the DEA's possession.  It could show whether one or more of the pharmacy's patients are also known to have engaged in criminal activity by unlawfully reselling the medications, or to have suffered or died from an overdose, or is a patient of a prescriber the DEA is investigating.  ECF No. 1-1 at 9 ¶ 27.

In response, the State does not suggest that these reasons for seeking the patient-identifying information are not relevant to the investigation. Instead, the State suggests its own approach—that the DEA "could easily identify those individuals in a subpoena."  ECF No. 18 at 1.  But this alternative investigative suggestion does not carry the State's burden to show that the DEA's bases for seeking the patient information are not relevant.  Nor is the State's proposed protocol practical: the list of names the DEA would give the State would be enormous, ever-changing, potentially law-enforcement privileged, and incomplete.  To take one example, the State's approach would not enable the DEA to identify a patient of the pharmacy who is being investigated for reselling prescription medications in another state, and the DEA cannot feasibly inform the State of all names of all individuals under DEA investigation.

*Second*, patient names and other patient-identifying information can shed light on the effectiveness of the pharmacy's overall controls on improper dispensing.  ECF No. 1-1 at 9 ¶ 28.

The DEA gives several examples of types of dispensing conduct where some aspect of a patient's name or address could present a red flag to a pharmacist.[9]  *Id.*

In response, the State asks why these red flags "cannot be discerned from the pharmacies' transactions alone, without the true patient identities."  ECF No. 18 at 28.  But the State's objection fails to recognize that the examples the DEA has given are ones where knowledge of the patient's identity or other patient-identifying information are *needed* to reveal the red flag, and thus to shed light on whether the dispensing conduct was potentially improper.  Under the State's approach, for example, the DEA could not see that a pharmacy dispensed controlled substances to patients who claimed their names were Woody Woodpecker and Yosemite Sam. Nor could the DEA identify if the pharmacy dispensed multiple prescriptions to the same person who used numerous nicknames (*e.g.*, William, Will, Willy, Bill, Billy, *etc.*) because those iterations will show up in the State's proposed production as different pseudonyms.  Nor could the DEA determine whether the pharmacy dispensed to a group of patients who all purported to reside at a fictitious address, or at the same address, or an address where the DEA suspected unlawful diversion of controlled substances.[10]  Simply put, the DEA cannot properly evaluate

---

[9] The State observed that PDMP records will not show if the pharmacist queried the PDMP. But the PDMP records will show what the pharmacy knew about its *own* history of dispensing to the patient, because the PDMP data is the data the pharmacy itself has reported to the State.

[10]      The State comments that Colorado pharmacists are not expressly required by statute to check the PDMP, ECF No. 18 at 28, but this observation does not show that Colorado pharmacists lack any obligation to conduct due diligence on patients.  The DEA requires pharmacists who dispense controlled substances to adhere to the "usual course" of their professional practice, 21 C.F.R. § 1306.06, and Colorado law requires that "A pharmacist shall make every reasonable effort to ensure that any order … has been issued for a legitimate medical purpose by an authorized practitioner."  3 Colo. Code of Regs. § 719-1, § 3.00.21.  In 2014 the Colorado Pharmacy Board, with other regulators, issued a policy that "dispensers should utilize the Prescription Drug Monitoring Program (PDMP) prior to … dispensing opioids" and that their duties to check patients can include "exercising judgment and conducting research if appropriate

whether there are red flags a pharmacy is ignoring when the DEA is not even allowed to obtain the patient-identifying information presented to, and then reported by, the pharmacy.

*Third*, patient-identifying information helps the DEA identify witnesses to interview. ECF No. 1-1 at 9-10 ¶ 29. The State does not suggest that this investigative purpose is not useful; rather, it suggests that the DEA could wait and seek such information in future requests. ECF No. 18 at 28. In short, the State proposes a delay, but does not show any lack of relevance.

*Fourth*, the DEA uses patient-specific information to obtain an overall sense of a pharmacy's dispensing practices. ECF No. 1-1 at 10 ¶ 30. The State does not suggest that such data analysis is not useful; indeed, the Pharmacy Board itself is tasked by law with such data-crunching, as the PDMP statute requires that the Board "shall" analyze the PDMP data "for indicators of misuse, abuse, and diversion". Colo. Rev. Stat. § 12-280-404(8). Data analysis routinely assists with discovering trends and patterns—*e.g.*, recognizing that a set of patients may share certain patient-identifying characteristics, like the same address. The State notes that the DEA does not describe its investigative techniques, ECF No. 18 at 28, but the State cites no law requiring an investigative agency to prove relevance by revealing its investigative approach.

*Finally*, the State suggests that regulations adopted under the Health Insurance Portability and Accountability Act somehow "add further demands to what showing is required for law enforcement access to health information." ECF No. 18 at 29. The State does not explain how HIPAA adds to the required showing. In any event, its reference to HIPAA is inapposite.

---

(such as use of the PDMP or communication with the prescriber or relevant pharmacies)." *See* Quad-Regulator Joint Policy for Prescribing and Dispensing Opioids (2014), found at http://www.ucdenver.edu/academics/colleges/PublicHealth/research/centers/CHWE/Documents/DORA%20Opioid%20Policy%20Revised%2010.15.14.pdf

HIPAA does not set limits on the information the DEA can obtain by administrative subpoena in

this context.  As the State acknowledges, HIPAA "is not applicable to the State Respondents."

*Id*.  Moreover, even if the State were a "covered entity," HIPAA expressly allows the disclosure

of patient-identifying information when the DEA is conducting CSA investigations.[11]  *See* Final

Rule: Dep't of Health and Human Services, Standards for Privacy of Individually Identifiable

Health Information, 65 Fed. Reg. 82,462, 82,593 (Dec. 28, 2000) (explaining that the HIPAA

privacy rules would not impede the DEA's ability to enforce the CSA because "when the DEA

seeks documents to determine an entity's compliance with the CSA, such disclosures are

permitted under [45 C.F.R. §] 164.512(d) [as a health oversight agency]").

> **D.**     **The requests are also reasonably tailored to the investigation.**

The State's last argument is that the DEA "sought more information than is required for

its investigative purpose."  ECF No. 18 at 30.  But the DEA's request matches the data each

pharmacy itself reported to the PDMP.

In general, the proper scope of an administrative subpoena is "variable in relation to the

nature, purposes and scope of the inquiry."  *McLane Co. v. EEOC*, 137 S. Ct. 1159, 1162 (2017)

(quoting *Oklahoma Press Pub. Co. v. Walling,* 327 U.S. 186, 209 (1946)).  Where the

investigation relates to an inquiry of a party, the requested records must relate to that party.  *In re*

---

[11]      Unlike the inapposite HIPAA provision the State cites, the HIPAA provision that applies to the DEA as "health oversight agency," § 164.512(d), permits the release of protected health information— *without* the need to de-identify patient information—for "civil, administrative, or criminal investigations." 45 C.F.R. § 164.512(d).  Under this provision, if the DEA sought prescription records from a covered entity like a pharmacy or a prescriber, HIPAA would expressly allow disclosure to the DEA of those records, with all patient-identifying information included.  Thus, to the extent HIPAA provides a useful guide, it recognizes the DEA's need for patient information.

*Subpoena Duces Tecum*, 228 F.3d 341, 350 (4th Cir. 2000) (explaining that if a doctor "had treated 15,000 patients over a period of seven years and all of them were reimbursed on claims he submitted, a suspicion of fraud on these claims would justify a review of [his] documentation of services to these patients, of the claims submitted on their behalf, and of the reimbursements collected. Even though these documents might be numerous, they would reasonably relate to and further the government's legitimate inquiry")

Under these broad standards, the records sought are reasonably limited.

*First*, the State mischaracterizes the DEA's request as seeking "a whole pharmacy's entire record of prescriptions."  ECF No. 18 at 9; *see also id.* at 10 (characterizing the DEA's request as seeking "the two pharmacies' entire record of all prescriptions dispensed").  But the records the DEA seeks are only part of the pharmacy's records.  The subpoenas seek only records relating to prescriptions for controlled substances, which are ordinarily a small subset of all prescriptions.[12]  The DEA is not seeking any of the numerous records the pharmacy may have that do not relate to prescriptions for controlled substances.

In addition, the DEA seeks only the limited set of information that the pharmacy reported to the PDMP as to those controlled substances prescriptions.  The data it seeks thus includes only the set of fields the State requires the pharmacies to report, not any other information a pharmacy may maintain on its patients (such as pharmacist notes on patients).  Also, because this data

---

[12]   For example, there are more than 20,000 FDA-approved prescription drugs. FDA, FDA at a Glance (Oct. 2019), available at https://www.fda.gov/media/131874/download.  But less than 300 drugs are currently controlled substances that may be prescribed under schedules II-V. See DEA, Controlled Substances by CSA Schedule (Aug. 21, 2019), *available at* https://www.deadiversion.usdoj.gov/schedules/orangebook/e_cs_sched.pdf; *see also* 21 C.F.R. §§ 1306.11; 1306.21.

request is limited to the information reported to the PDMP, the information the DEA seeks is limited to the specific set of data that the patients would have been warned would be provided to the government.  Moreover, because the records sought relate only to prescriptions filled at the two pharmacies under investigation, the data would not include information on prescriptions the patients filled at other pharmacies.

**Second**, the State asserts that the DEA's request includes "all manner of medications for which no law enforcement interest could possibly exist."  ECF No. 18 at 30.  But the DEA's request is limited to controlled substances, a category of drugs that are dangerous and often subject to abuse.  Controlled substances in schedules II through V, by definition, are those that have significant potential for abuse and dependence. 21 U.S.C. § 812.  While they may have a legitimate medical purpose, they are still dangerous drugs.

The State states that it "can imagine no rationale" why the DEA is inquiring about prescriptions relating to amphetamines (dextroamphetamine, Vyvanse), benzodiazepines (alprazolam, clonazepam) and an anabolic steroid (testosterone).  ECF No. 30.  But it is a matter of public record that these controlled substances can be dangerous and may be abused.  Benzodiazepines and amphetamines are two of the most commonly misused prescription drugs.[13] Benzodiazepines have received significant attention recently after a sevenfold increase in overdose deaths.[14]   The two amphetamines identified by the State warn, on their labels, that they

---

[13]      *See* Nat'l Institute on Drug Abuse, Commonly Abused Prescription Drugs, available at https://www.drugabuse.gov/sites/default/files/rx_drugs_placemat_508c_10052011.pdf (last visited Dec. 21, 2019).

[14]      *See, e.g.*, Colorado Consortium for Prescription Drug Abuse Prevention, Prescription Drug Abuse Dashboard (July 17, 2019), available at http://www.corxconsortium.org/wp-content/uploads/New-Prescription-Drug-Abuse-Data-Dashboard1.pdf (discussing that "[b]enzodiazepines were involved in 30% of the pharmaceutical opioid related overdose

present serious dangers and risks of misuse.[15]  And anabolic steroids (such as testosterone), 21

U.S.C. § 802(41) (defining anabolic steroid), are frequently misused.[16]

Moreover, the DEA is investigating *combinations* of controlled substances dispensed by

the two pharmacies.  ECF No. 1-1 at 8 ¶ 23.  Combinations of controlled substances are often

dangerous.  For example, benzodiazepines have been publicly recognized as very dangerous

when combined with opioids.  Benzodiazepines are sought on the street as part of the "holy

trinity"— an opioid, a benzodiazepine, and a muscle relaxant, a dangerous combination that is in

high demand for illicit sales.[17]

---

deaths"); Colorado Public Radio, "Benzodiazepines: America's 'Other Prescription Drug Problem,'" Apr. 26, 2018, available at https://www.cpr.org/2018/04/26/benzodiazepines-americas-other-prescription-drug-problem/

[15]     "Amphetamines have a high potential for abuse; prolonged administration may lead to dependence. Misuse of amphetamines may cause sudden death and serious cardiovascular adverse reactions." Highlights of Prescribing Information, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2013/021303s026lbl.pdf(last visited Dec. 18, 2019).  "[Central Nervous System] stimulants (amphetamines and methylphenidate-containing products), including VYVANSE, have a high potential for abuse and dependence." Highlights of Prescribing Information, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/208510lbl.pdf (last visited Dec. 18, 2019).

[16]     *See* Nat'l Institute on Drug Abuse, Anabolic Steroids (rev. Aug. 2018), https://www.drugabuse.gov/publications/drugfacts/anabolic-steroids; *see also* DEA, Anabolic Steroids (Mar. 2004), https://www.deadiversion.usdoj.gov/pubs/brochures/steroids/public/.  The State suggests that testosterone is approved to treat male impotence (ECF No. 18 at 6, 11), but it is not.  The FDA-approved male impotence drugs—Sildenafil (Viagra); Tadalafil (Adcirca, Cialis); Vardenafil (Levitra, Staxyn); Avanafil (Stendra)—are not controlled substances; they require a prescription but are not reported to the PDMP, and records of those prescriptions are not sought here by the DEA.

[17]     *See* Sam Tabachnik, "Denver doctor pleads guilty to prescribing dangerous 'Holy Trinity' combination of drugs," Denver Post (Oct. 3, 2019), *available at* https://www.denverpost.com/2019/10/03/andrew-ho-opioids-guilty-plea/; *see also* Pharmacy Times, "The Perfect Storm: Opioid Risks and 'The Holy Trinity'" (Sept. 24, 2014), *available at* https://www.pharmacytimes.com/contributor/jeffrey-fudin/2014/09/the-perfect-storm-opioid-risks-and-the-holy-trinity (describing the dangers and the pharmacist's corresponding responsibility).

The State does not address these dangers.  It points out that there are lawful purposes for these prescriptions for controlled substances, ECF No. 18 at 30, but such lawful uses do not show that these controlled substances do not also present dangers.  The Supreme Court in *Whalen*—in upholding law enforcement access to the database of controlled substances prescriptions—acknowledged that there were many lawful uses for controlled substances, such as treatment for pain, "epilepsy, narcolepsy, … and migraine headaches." 429 U.S. at 593 n.8; *see also id.* at 601 n.27 (noting concerns about reporting from "parents on behalf of their pre-adolescent children who are receiving amphetamines").

*Third*, the State implies that the time period of the request (from January 2014 to present) is unreasonable.  ECF No. 18 at 30.  But the State offers no specific argument on this point.  The time period sought is reasonable.  This request does not encompass all of the PDMP's data, which extends back to 2011.  ECF No. 18-1 (McGovern Decl.) at 3 ¶ 15.  The DEA's request reasonably covers the period within the statute of limitations for civil and criminal penalties for dispensing-related violations.  *See* 28 U.S.C. § 2462 (5-year time bar for civil penalties); 18 U.S.C. § 3282 (5-year time bar for criminal penalties).  The DEA may reasonably gather evidence before the beginning of the limitations period because evidence of time-barred violations can be relevant to proof of conduct that falls within the limitations period.  *See, e.g., RSM, Incorporated v. Herbert*, 466 F.3d 316, 323 (4th Cir. 2006) (holding that the government may use evidence of time-barred violations to show that the defendant committed violations within the limitations period or to show the defendant's mens rea); *accord* A*rticle II Gun Shop Inc. v. Gonzales*, 441 F.3d 492, 496-97 (7th Cir. 2006).  Moreover, this period back to 2014 is a

period through which the prescription drug abuse crisis has raged, and it is reasonable for the DEA to gather evidence from 2014 forward to assess patterns and trends during this period.

*Fourth*, the State suggests that the data set the DEA seeks should be limited by geography because it includes "large numbers of patients who necessarily are within the ordinary market area of the pharmacy, and thus for which no suspicious geographic considerations would apply." ECF No. 18 at 31. But the DEA has never suggested that the *only* factor that would show improper prescribing is the patient's distance from the pharmacy. The DEA has identified a host of other patient-identifying factors relevant to its inquiry. ECF No. 1-1 at 8-10, ¶¶ 25-31.

*Finally*, an argument the State does *not* make is that it would face any difficult administrative burden in complying with the DEA's subpoenas. It appears that the State has already had its private vendor, Appriss, gather the requested data, and then further manipulate the data to remove data. ECF No. 18-3 at 2 ¶ 8. The State has removed the patient-identifying fields; in addition, the State has removed, without explanation, other important fields that would not identify patients: Drug Category, DEA Schedule, Units, and Days Supply. The DEA requests that the Court order the State to produce all of the fields the pharmacies reported to the PDMP, including both the patient-identifying fields as well as these other omitted fields.

## CONCLUSION

Because this Petition relates to ongoing investigations, the DEA respectfully requests that the Court resolve the Petition promptly, and issue an order directing the Pharmacy Board and Executive Director Salazar to comply with the subpoenas. It does not appear that an order to Appriss is necessary: while Appriss asks that it not be directly ordered to respond to the

subpoenas, it avers that if the Court orders the production, it is "prepared to assist Colorado in responding to the Subpoenas consistent with any court directives."  ECF No. 17 at 2.

Respectfully submitted this 4th day of November, 2019.

JASON R. DUNN
United States Attorney

*s/ Kevin Traskos*
Kevin Traskos
David Moskowitz
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, CO  80202
Telephone:  303-454-0100
Email:  kevin.traskos@usdoj.gov
Email:  david.moskowitz@usdoj.gov

Counsel for the U.S. Department of Justice,
Drug Enforcement Administration

**CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2019, I electronically filed the foregoing with the Clerk of

Court using the ECF system, which will send notification of such filing to the following email addresses:

pam.jackson@coag.gov
Christopher.Beall@coag.gov
robby.staley@coag.gov
krista.batchelder@coag.gov

tgleason@fbtlaw.com
cskolnick@fbtlaw.com

sneel@aclu-co.org

*s/ Kevin Traskos*
Office of the U.S. Attorney